Plaintiff appealed from judgment rejecting her suit to recover damages sustained by her from the effects of drinking part of the contents of a bottle of Coca-Cola, a soft drink, allegedly contaminated, manufactured and sold by defendant. She alleged that on the morning of March 11, 1942, she purchased from J.W. Henry, who conducts a small retail store in Ouachita Parish, the bottle of Coca-Cola, and after swallowing a part of its contents detected various forms of foreign matter therein; that she immediately became ill, was taken to a clinic where the contents of her stomach were pumped out by a physician; that she returned home that afternoon but continued to be treated by the physician until the 16th of March, at which time, on his advice, she became a patient in his clinic and remained therein for eight days; that from the time of the drinking of the Coca-Cola until she left the clinic, she vomited intermittently and experienced severe pains. She further alleged that the bottle of Coca-Cola was in the same condition when sold to her as when delivered by defendant to Henry. She accredits to the allegedly contaminated Coca-Cola the illness, pains, etc., which will be hereinafter discussed. To disclose a cause of action against the defendant she avers that through its negligence and carelessness foreign matter was allowed to enter and remain in the bottle; and she additionally alleges that defendant did not sterilize and properly cleanse the bottle prior to filling it.
Plaintiff, in addition to the damages allegedly sustained by her, sues to recover the amount of physician's, medical and hospital expenses incurred in treating and relieving her illness.
Defendant denied all the allegations of the petition save that it is a commercial *Page 581 
partnership composed of M.S., H.A., B.W., and E.L. Biedenharn, residents of Ouachita Parish. Further answering, defendant alleged at length and in detail the manner and methods employed by it in the manufacture and bottling of Coca-Cola to the end that so far as humanly possible the contents of each bottle may be pure and remain in that condition until sold by it; that if the bottle of Coca-Cola from which plaintiff drank contained any foreign substance, such substance was not therein when it left defendant's possession. In the alternative, firstly, defendant pleads that if plaintiff became ill at the time and in the manner as by her alleged, it was the result of causes to no extent connected with the drinking by her of the Coca-Cola; and, secondly, in the alternative, defendant avers that if it is proven upon trial that the bottle contained a foreign substance and that defendant is to any extent responsible therefor, in that event, the same did not cause plaintiff any inconvenience, sickness or injury.
The testimony shows that near the noon hour of March 11, 1942, plaintiff, accompanied by two sisters, walked from her residence to the Henry store, a short distance, and there a bottle of Coca-Cola for each was purchased. Mr. Henry removed the caps therefrom. After a swallow or two by plaintiff she detected "something" in her mouth, walked to the door a few feet away, and spat out the liquid. Several persons present, including plaintiff, examined the bottle and observed in the liquid some of the same substance which, presumably, had entered plaintiff's mouth.
Immediately after expelling the liquid, plaintiff began to gag which was very soon followed by intermittent spells of vomiting. After the lapse of an hour or so she decided to go to Monroe and consult a physician. Her husband and a sister accompanied her, the latter driving the car in which they traveled. She carried the partially emptied Coca-Cola bottle with her for laboratory analysis. On the trip to Monroe she suffered from nausea and vomited several times and was so affected when she arrived at the clinic. She consulted Dr. George W. Wright who testified that she was then "pretty well dehydrated, having perhaps vomited more food than she had taken in". She remained at the clinic for two or three hours and returned home. Her condition did not improve and for that reason she returned for treatment on each of the following three days. The nausea and vomiting persisted and on the 16th day of the month she became a patient in Dr. Wright's clinic and was under his observation and treatment until her physical condition was measurably corrected. She was discharged from the clinic eight days later, but spent the greater part of the following twelve days in bed. The doctor continued to treat her regularly for several weeks thereafter.
The laboratory technician in Monroe, to whom the remaining contents of the Coca-Cola bottle were submitted for analysis, was not equipped to make a complete chemical analysis thereof. It was analyzed for alkalinity but none was found. The organic matter therein was mucoid in character and accumulated in the bottom of the bottle. When viewed at Henry's store it was about one-half inch long and the size of an ordinary cigarette. By shaking the bottle this matter would disintegrate, leaving the liquid turbid. In this condition it would easily pass through filtering paper but if unmolested for a day or so would resume the form and character it had before the bottle was shaken. It was not thought that the substance was poisonous. When the case was tried these mentioned facts constituted all the information known to counsel and imparted to the court, touching the quality and nature of this substance.
At the termination of the trial, on suggestion of defendant's counsel, concurred in by plaintiff's, the judge, in the presence of both counsel, placed a specimen of the content of the bottle in a sterilized container, sealed the same and handed it to the court reporter with instructions to forward same to some reputable analytical chemist for analysis. This was promptly done. The chemist's report is now a part of the record and was considered by the court in reaching a decision. The analysis disclosed that the liquid did not contain any poisonous or foreign substance at all, but, on the contrary, contained only those ingredients that properly belong in the standard Coca-Cola. The report further contains this significant information, to-wit: "The sediment in this bottle was found to consist of yeast cells, which were probably present due to the fermentation of the sugar which the Coca Cola contains. It is not my opinion, however, that an *Page 582 
original properly sealed bottle of Coca Cola would have developed fermentation, before being opened."
Giving to this report the weight it deserves, the conclusion must be reached that the abnormal condition of the Coca-Cola, when plaintiff drank part of it, was due to fermentation, which in turn was caused by defective sealing of the bottle. Presumably, on account of imperfect sealing the gas in the bottle escaped, air entered and fermentation followed. It is evident from this report that defendant stands exonerated from the two elements of negligence charged to it.
Neither side has asked that the case be remanded in order to amend pleadings or introduce testimony relevant to the facts revealed by the report. Both sides appear willing to have the case adjudicated upon the record as now constituted. We shall do so on the theory that the admission of the report as evidence in the case, without objection, effectuated broadening of the pleadings to that extent.
Mr. Henry testified that the bottle of Coca-Cola was in the same physical condition when sold to plaintiff as when delivered to him by defendant's agent; that after being delivered to him the bottle was placed in a cooler or ice box and remained therein until opened for plaintiff. His testimony in this respect is to no extent contradicted. It does not appear how long the bottle had been in Henry's possession but it is shown that his supply of this drink was renewed weekly. No testimony was offered touching the handling of the box containing this particular bottle while being transported to Henry's store.
The record warrants the conclusion that a prima facie case of negligence against defendant has been established. The doctrine of res ipsa loquitur has application. It is as much the duty of a bottler of soft drinks to securely cap each bottle it offers for sale as it is to include only proper ingredients therein and exclude insects, foreign substances, etc., therefrom. Unless each bottle is sealed in such manner as to retain the gas therein, exclude and keep excluded air therefrom, the drink becomes unpalatable and, dependent upon the quality of the ingredients, fermentation follows.
The rule of law enunciated in the recent case of Ortego et al. v. Nehi Bottling Works et al., 199 La. 599, 6 So.2d 677, it seems to us, renders conclusive defendant's negligence in the present case. The court in this case, as is reflected from the syllabus, held: "Proof by person injured by explosion of bottled beverage that bottle was not improperly handled after it left possession of bottling company, constitutes a `prima facie case' of negligence against company, since it must be assumed that a bottle will not explode when properly handled in absence of some defect in bottle or improper charging or mixture of contents."
If a manufacturer of soft drinks may be held liable in damages resulting from the explosion of a bottle filled by it, but not made by it, due to defects therein, a fortiori should a manufacturer of such drinks be held responsible for damages that result from application of a defective cap to or imperfect sealing of a bottle.
Plaintiff is sickly, very nervous, and is unusually susceptible to nausea and vomiting. She has submitted to three major operations. Fifteen years ago her appendix was removed; four years thereafter she was operated upon for ulcers of the stomach and four or five years ago a kidney was removed. But for two or three months prior to this Coca-Cola drinking incident, she was free of nausea and vomiting. She frequently visited doctors for treatment for different symptoms. She has not done housework for twelve or fourteen years, not even making up her bed. However, on the morning of the incident she and two of her sisters went fishing not far from her home.
It is certain the nausea and vomiting that afflicted plaintiff during the several days following the drinking of this Coca-Cola were much more serious than any theretofore experienced. Her husband testified that during the night of March 11th he thought she would die from continuous vomiting. She daily drank Coca-Colas but the one in question was the first to disturb her stomach. It is not surprising that after feeling this slimy, mucous substance in her month, thinking she had possibly swallowed some of it, and viewing more of it in the bottle, her reactions were as violent as the record discloses them to have been.
In cases of this character, to recover, the plaintiff carries the burden of establishing by a preponderance of testimony, *Page 583 
three facts, to-wit: (1) Actual injury; (2) that the beverage was the cause of the injury; and (3) that the bottled beverage had not been improperly handled after it left the manufacturer's possession. It is our opinion plaintiff has successfully met this burden.
It is suggested that because plaintiff had been afflicted with ulcerated stomach, had undergone serious operations, and had suffered from nausea and vomiting periodically in the past, drinking by her of any beverage, however wholesome, it was possible, could bring on a recurrence of these symptoms. Dr. Wright's testimony negatives this contention; and, in addition, it is shown that plaintiff regularly drank Coca-Colas without injurious or unpleasant effects. The fact that she was seized with the paroxysm of nausea and vomiting so quickly after drinking the Coca-Cola and viewing the remaining contents of the bottle, augmented by the fact that not theretofore had these symptoms been so violent, frequent and persistent, goes far, in fact, sufficiently far, to establish with legal certainty causal connection between drinking the Coca-Cola and the named effects. Surely, it cannot be assumed that she would have had this horrible experience had she not partaken of this particular Coca-Cola; and this being true, the proximate cause of her illness and injury obviously was drinking of it.
Consonant with the first alternative defense, defendant's assiduous counsel argue: "We submit that in the case at bar plaintiff's product contained no injurious substance and that, if any damage resulted, same was due to the psychic condition of plaintiff and to a circumstance which defendant could not have foreseen. We emphasize that in this case defendant exercised every care in bottling its beverages; it used the most modern machinery known to the industry; its product contained nothing injurious and nothing foreign to the ordinary Coca-Cola which millions of people throughout the nation drink every day. If yeast cells, which were not injurious, formed after defendant bottled and sold the Coca-Cola, it cannot be said that they formed as a result of any negligence of defendant. And certainly it cannot be said that plaintiff anticipated the trouble which plaintiff in this case alleges resulted by virtue of her drinking or seeing yeast cells in the Coca-Cola."
The court, in written reasons for judgment, sustained both of the defenses contained in this argument.
It is beyond dispute that in the preparation and bottling of is products, defendant exercised the utmost care to protect the contents against contamination, and that the mechanical equipment employed by it in cleansing, filling and capping the bottles is modern and highly efficient. On neither score can criticism be justly made. However, the jurisprudence of this court and of others in the state and elsewhere, is conclusive that regardless of the care exercised and the character of the equipment employed, in the preparation and bottling of soft drinks, errors and oversights occur and lawsuits follow. The human element is always present.
Concerning plaintiff's physical condition and the psychic effect upon her from drinking this Coca-Cola, the testimony of Dr. Wright is quite enlightening. After relating that her condition continued to grow worse until she entered the clinic as a patient, he testified:
"Q. Now, what was her condition, Doctor; what were your findings? A. She had a severe acidosis as a result of her steady vomiting, running consistently a sub-normal temperature and a rapid pulse, and, of course, the continued vomiting and nausea, subjective.
"Q. In your opinion, was her condition the result of having drunk some foreign matter? A. It could have been; yes, sir; we treated her with the view of that having been the cause.
"Q. How sick was she, Doctor? A. She was pretty sick. We had to use sedation and sedatives and fluid intraveneously."
Following his testimony that the content of the bottle was not poisonous, he also testified:
"Q. Now, proceeding on that statement of facts, your testimony would be, would it not, that the Coca-Cola could not have caused the trouble that developed in Mrs. White, and for which you treated her? A. Directly, no; indirectly, yes; because you have to take into consideration the psychic influence of what she took.
"Q. If she had been influenced from a psychic standpoint, and I assume that you mean by that in the mind specifically — A. I wouldn't say that exactly; I think *Page 584 
that different things affect different stomachs differently, without them being toxic."
Dr. Wright added, in response to questions, that the average person in good health should recover from swallowing such substance, an hour or so after vomiting, and further testified:
"Q. Now, in your opinion, is Mrs. White subject to being influenced from a psychic standpoint? A. I think that any individual that has had lots of sickness would be; and I think that the recurrent vomiting in this, irrespective of what the cause would be, would be a little bit more severe with a person who had been sick and had had some stomach disturbance.
"Q. Do you recall ever seeing her vomit? A. I think so; yes.
"Q. When was that? A. Well, I have had her complain of her stomach or digestive disturbances, etc., previous to this time. Of course, I saw her vomit when I had her in the hospital on other occasions.
"Q. The fact that she vomited is nothing new so far as she is concerned? A. This was a recurrent proposition; anything that you would put in her stomach would come right back up, and what she would vomit would be considerably more than she was putting in the stomach and the thing was fuel weakening.
"Q. But during the times that you had treated her on previous occasions she had been vomiting and had vomited and had had stomach disturbances? A. Yes, sir.
"Q. What do you think caused that vomiting? A. This was a reflex condition, not her old trouble.
* * * * *
"Q. Doctor, would you say that even though the mass that you saw in this bottle of Coca-Cola which was delivered to you was not, in itself, poisonous, that it was of such foreign substance as to bring about a condition of vomiting and nausea? A. Yes, sir; I think it could make me vomit.
* * * * *
"Q. The fact that she had a very weak stomach, and then to drink a foreign substance, such as you saw in this bottle of Coca-Cola, it would be more apt to cause the nausea condition that you found? A. That is correct.
"Q. During the time she was in your hospital, she was treated for nausea condition and the upset stomach? A. Yes, sir; and vomiting.
"Q. And she remained in your hospital several days? A. Yes, sir.
"Q. And would you say that was a continuation of the condition that she was suffering when you first saw her when she presented this bottle? A. Yes, sir."
As we view this case it is not in principle distinguishable from many others in this state arising from injurious effects of drinking or taking into the mouth liquid which is contaminated and/or contains some foreign matter or substance offensive to the senses, especially that of taste. It is the mental reaction which follows that produces the nausea and vomiting. The reaction of a person possessed of a weak stomach is generally more violent and the ill effects persist longer than they do with one not so affected.
We think the principles of law applicable to cases involving "Emotional Distress Unintended", discussed by counsel, are not pertinent to the facts of the present case.
In the case of Hollis v. Ouachita Coca-Cola Bottling Company, Ltd. reported in La.App., 196 So. 376, plaintiff took into her mouth a spider that was in a bottle of Coca-Cola she was drinking. No part of the insect was swallowed. She instantly spat it out. Her reactions were immediate and violent. She was sick for nearly two weeks.
In Kelly et al. v. Ouachita Dairy Dealers Cooperative Association, Inc., La.App., 175 So. 499, it was shown that Mrs. Kelly drank some buttermilk sold her by the defendant, which contained maggots. It was shown, as was true in the Hollis case, that the bottle had not been opened prior to the time of the drinking. Maggots are not poisonous and some spiders are not, but that fact did not prevent the plaintiff in each of these cases from becoming sick and vomiting extensively.
In each of the named cases damages in the sum of $600 were awarded. In the present case plaintiff's counsel intimates rather clearly that such an award will satisfy plaintiff. All things considered, we think this amount adequate.
Objection was made to the admissibility of any testimony to prove the amounts of physician's, hospital and medical bills incurred in treating plaintiff, unless it could be shown that these expenses were paid from her own separate paraphernal *Page 585 
funds. Obviously these expenses are community liabilities and may only be sued for by the husband, the head and master of the community.
For the reasons herein assigned, the judgment appealed from is annulled, avoided and reversed, and there is now judgment in favor of plaintiff, Mrs. Mary Alice White, and against defendant Coca-Cola Bottling Company, and the individual members thereof, in solido, to-wit: M.S. Biedenharn, H.A. Biedenharn, B.W. Biedenharn and E.L. Biedenharn, for the sum of $600 with interest thereon from judicial demand until paid, and for all costs of this suit.