Plaintiff seeks judgment against the defendants, Homer Coca-Cola Bottling Company, Inc. (hereinafter referred to as the Bottling Company), and its insurer, Hartford Accident and Indemnity Company, for damages allegedly sustained by him from drinking a portion of the contents of a bottle of Coca-Cola manufactured by the Bottling Company, in which thereafter was found a decomposed spider. His action is predicated upon allegations to the effect that the contents of the bottle became poisonous through the neglect of the Bottling Company in allowing the spider to be enclosed therein in the process of filling.
Defendants articulately deny the allegations relied upon by plaintiff for recovery, particularly those which charge the Bottling Company with negligence in the preparation and capping of the Coca-Cola in question. Further answering, defendants set out at length and in detail the manner and methods employed by the Bottling Company in cleansing, filling and capping its bottled goods by the use of up-to-date, modern and efficient machinery.
Defendants further plead that if any spider was in the Coca-Cola bottle when plaintiff drank therefrom, it was therein through the negligence and carelessness of the Bays Service Station, from whom he purchased it.
Further answering, it is alleged, in the alternative, that if it should be found and held that there was any foreign matter in a bottle of Coca-Cola manufactured by the Bottling Company, from which defendant drank, and that said company is responsible therefor, in such event plaintiff did not suffer any inconvenience, sickness or injury from the drinking.
Plaintiff was awarded judgment for $500 and defendants appealed. An increase in the judgment is asked in answer to the appeal.
Plaintiff drove his car to the Bays Service Station in the Town of Homer, Louisiana, for service, and while this was being done, he asked for a Coca-Cola. Mr. Bays, operator of the station, took a bottle from a box wherein bottled drinks were chilled, removed the cap therefrom and handed it to plaintiff, who drank a small quantity of its contents. He immediately discerned that it did not "taste right" and imparted this to Mr. Bays, who was standing nearby. He drank no more of it and set the bottle on the office desk without examining the contents for foreign matter. Within a very brief time he became violently sick, turned pale and vomited three times. His condition became such that Mr. Bays advised him to consult a physician. He was driven by an employee of the station in Mr. Bays' car to the office of Dr. Featherstone. This physician described plaintiff's condition and appearance while in his office, as follows: "He showed signs of acute indigestion, pale, pulse running away with him, vomiting, sick at his stomach, had the appearance of a man sick from acute indigestion seemingly."
Dr. Featherstone thought plaintiff's trouble was acute indigestion and gave him codeine and strychnine to quiet him. While being treated at the time he told the doctor that he was poisoned from drinking a Coca-Cola. The treatment was not *Page 188 
changed as relief was being attained. Dr. Featherstone suggested that he call Dr. Middleton, the Parish Coroner, and have him examine the remaining contents of the bottle and procure chemical analysis of it. The bottle was sent for and after considerable delay Dr. Middleton arrived. He had the liquid in the bottle run through a gauze. The spider was retained thereon. However, before Dr. Middleton arrived Dr. Featherstone detected the spider inside the bottle, as he says, "swimming in a white scum". By this language we understand that the spider was enveloped in scum and floating in the liquid.
It is regrettable that the contents were lost before chemical analysis thereof could be had. They poured into a sink after passing through the gauze.
There is no dispute that the bottling company manufactured and delivered to the service station the bottle of Coca-Cola from which plaintiff drank, and it was proved that its physical condition at time of delivery underwent no change prior to the removal of the cap by Mr. Bays when he handed it to plaintiff.
It is strenuously argued that because some two hours elapsed from the time plaintiff drank from the bottle and time of its delivery to Dr. Featherstone, substantial doubt arises as to the identity of the bottle and as to the contents being the same during the period. Suggestions are made as to possible happening in the interim. Mr. Bays is positive the bottle was not touched nor tampered with from the time plaintiff set it on his desk after drinking therefrom, and when he recapped same and handed it to his colored employee to take to Dr. Featherstone. It is a little strange, however, that Mr. Bays did not closely inspect the bottle and its contents after plaintiff told him the liquid did not taste right, and particularly after plaintiff became so ill.
We are convinced from the testimony that the bottle and its contents delivered to Dr. Featherstone was the same from which plaintiff drank, and that no change in its contents transpired before it reached the doctor.
Dr. Featherstone finally decided, after seeing the spider in the bottle, that plaintiff's illness was caused by drinking the contaminated Coca-Cola; the symptoms he observed in plaintiff would be expected in one drinking poisonous liquid.
[1] The facts of this case distinguish it from nearly all the other cases in this state wherein contaminated Coca-Cola was drunk. In those other cases, with an exception or two, it was made clear that some part of the foreign or deleterious matter was taken into the mouth of the drinker and that the emotions were so aroused by mental and physical reactions that ill effects followed. But, here the plaintiff did not know that a spider was in the bottle until the violence of the paroxysm had passed. So far as he knew, and now knows, no part of the putrid insect was swallowed by him. Therefore, if defendants are to be cast in damages it must be on the theory that that part of the liquid drunk by the plaintiff was so highly charged with poison from the spider as to produce the effects described.
It is seriously contended that plaintiff failed to prove that the Coca-Cola drunk by him was poisonous. That fact could only have been directly and positively proven by an analysis of the remaining part of the liquid. That was made impossible through no fault of plaintiff.
[2] In the absence of chemical analysis of the liquid we are authorized and required to weigh other pertinent facts and circumstances in the quest to determine what so suddenly brought about the transition in plaintiff's physical condition.
So far as the record discloses, at the time of drinking the Coca-Cola, and prior, plaintiff was in good health and sound physically. He did complain of a headache to Mr. Bays, but such ailment, without other complications, has no real significance. Many people known to be sound physically and mentally frequently suffer from such ailment.
[3] We have here a man sound in mind and body suddenly thrown into a paroxysm of pain and nausea, accompanied by vomiting, so severe as to require the attention of a physician. He performed no act nor did he eat or drink anything at the time save the contaminated Coca-Cola, that could have produced such a sudden transition in his physical condition. He did not know the spider was in the bottle at the time and so he cannot justly be accused of seizing upon its presence therein to feign sickness as a predicate for the suit he now prosecutes. In view of these facts it is but natural that plaintiff would have quickly accredited his illness to drinking the Coca-Cola. *Page 189 
Dr. Featherstone, after due consideration of the facts, finally concurred in this conclusion. In our opinion there is no reasonable escape from conceding the correctness of this conclusion. Undoubtedly that portion of the liquid drunk by plaintiff was of such character, due to the spider's decomposed condition, to cause the illness which befell him.
We do not doubt that the Bottling Company in the cleansing of its bottles and the preparation of its drinks preparatory for consumption by the public employs the highest degree of care and precaution humanly possible; and has the most modern and efficient equipment necessary to the conduct of its business. But, notwithstanding all of this, it is possible for foreign matter, insects, etc., to be enclosed in the bottles. Touching this phase of the case, that which was said by us in White v. Coca-Cola Bottling Company, 16 So.2d 579, 583, is apropos, to-wit: "It is beyond dispute that in the preparation and bottling of its products, defendant exercised the utmost care to protect the contents against contamination, and that the mechanical equipment employed by it in cleansing, filling and capping the bottles is modern and highly efficient. On neither score can criticism be justly made. However, the jurisprudence of this court and of others in the state and elsewhere, is conclusive that regardless of the care exercised and the character of the equipment employed, in the preparation and bottling of soft drinks, errors and oversights occur and lawsuits follow. The human element is always present."
On the same subject we quote an enlightening statement made by the Orleans Court of Appeal in Laborde v. Louisiana Coca-Cola Bottling Company, Ltd., 15 So.2d 389, 390, viz.: "The defendant is shown to have a very modern plant and to have taken all precautions against impurities and to have had a very low percentage of contaminated bottles. For example, out of 98,709,851 bottles of Coca-Cola manufactured by defendant in 1942, only 17,225 were found to contain foreign substances before the product left defendant's plant, but it is conceded that some bottles do have foreign substances in them and it is possible that some may have escaped the vigilant methods employed by the defendant and have reached the public."
Plaintiff contends that for six weeks he was totally incapacitated to perform his regular work which yielded him $50 per week, and that his eyes' vision is materially impaired and remains so from the effects of the poison.
[4] We dismiss from consideration the complaint about the eyes. He never consulted nor sought the services of an eye specialist to remedy the condition, if it existed, although he is amply able financially to have had competent service of the kind. He is fifty-seven years of age and it is unthinkable that he would allow a condition to continue which ultimately might result in the loss of functioning of so important organs as the eyes, when expenditure of a meager amount of money would probably remove all danger from the condition and insure unimpaired sense of vision for life.
[5] We are certain plaintiff exaggerates the ill effects of the experience he had. He was able, after the spell at the service station, to get into the car and out of same twice without assistance. He ascended the stairs to Dr. Featherstone's office without aid and after remaining there for an hour or two, descended the stairway to a car and went back to the station. He returned and again ascended said stairway and finally down them again unaided. Thereafter, the same day, he drove his own car to his home ten miles away. During the six weeks he claims total disability daily he drove his car either to Homer or Haynesville, five miles distant. The night of October 15th he attended a football game. This was less than thirty days after being poisoned. He offers no witness to corroborate his testimony concerning the asserted disability. We feel satisfied that after he left Dr. Featherstone's office the second time there remained little or no incapacitating effects of the illness. We are not convinced of the correctness of his testimony to the effect that he was unable physically or mentally to follow his usual work for six weeks after his illness.
In view of the conclusions above stated, we are constrained to believe the judgment excessive to the extent of $400. Therefore, for the reasons herein assigned, the judgment appealed from is amended by reducing the principal amount thereof to $100, and as thus amended, the judgment is affirmed. Plaintiff is cast for costs of appeal. *Page 190