124 So.2d 157 (1960)
Eddie WALKER, Sr., on behalf of the Community, his minor son, Eddie Walker, Jr., and Mrs. Lizzie Mae Walker, wife of Eddie Walker, Sr.,
v.
AMERICAN BEVERAGE COMPANY and New Amsterdam Casualty Company.
No. 21438.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1960.
*158 Lemle & Kelleher, Albert H. Hanemann, Jr., New Orleans, for defendants-appellants.
Revius O. Ortique, Jr., New Orleans, for plaintiffs-appellees.
YARRUT, Judge.
This is a suit to recover for personal injury allegedly suffered by Eddie Walker, Jr., the 10-year-old son of plaintiffs, when he drank a bottle of lemon-lime soft drink manufactured by defendant, American Beverage Company. There was judgment in favor of the father, for the use and benefit of his minor son (for $550) against both defendants, for pain and suffering, no special damages having been proved. The defendant Insurance Company is the liability insurer of American Beverage Company.
Many of the pertinent facts are not disputed. The soft drink was manufactured and bottled by the American Beverage Company. Plaintiffs purchased six bottles of soft drinks (4 lemon-limes and 2 Pepsi-Colas) from a corner groceryman. The bottles were not opened from the time they were received by the corner groceryman from defendant, delivered to plaintiffs, kept in their refrigerator, until 5:30 o'clock P.M. on September 12, 1958 at the family supper. For supper they ate "hot dogs" and each child had a soft drink. After eating the "hot dogs" and drinking most of his soft drink the son involved complained that he felt sick and nauseated and started to vomit. The boy complained that something smelled bad. The mother then smelled the bottle and detected a foul odor and claims she saw something in the bottle that resembled a piece of pork bone. A daughter then asked and was permitted by the mother to smell the bottle and take a sip, and she likewise said it smelled and tasted bad. The mother then gave her son a dose of citrate of magnesia.
The following day she took her son to Dr. Bertha N. Wexler, a pediatrician. Dr. Wexler found the boy suffering from an upset stomach; was cold and clammy; his temperature was elevated; that since he was vomiting so much she checked his physical condition and found, in addition, a softened and tender abdomen, though a physical examination from head to foot otherwise proved negative.
Dr. Wexler further testified the mother told her the boy had eaten "hot dogs" with a soft drink, and shortly after began to vomit. Dr. Wexler diagnosed his symptoms as gastroenteritis. When asked if that diagnosis was related to the ingestion of drink or food, her reply was that it could be. When asked if she had examined the residue of the bottle, she stated that all she did was to test it and the boy's urine with Litmus paper, in which she found a few casts; not an abnormal amount, three to five, in the urine; that she did a blood count which "just went *159 with the gastroenteritis." What this means she did not explain. Dr. Wexler said that with any fever the urine would be acid, but with the vomiting his blood became concentrated, hence the urine became concentrated and also became acid, all of which contributed to the upset stomach.
After describing virus gastroenteritis as a condition infecting the stomach and intestinal tract by a virile germ or food, she was asked if it was not possible that the child could have had the virile gastroenteritis at the time he consumed the drink. Her answer was that he could have, but his mother said he was well before supper. But it must not be forgotten that he had eaten the "hot dogs" before consuming the drink.
The only other expert who testified, and for defendants, was Mr. Cassius L. Clay, an analytical chemist. Mr. Clay testified that when the soft drink was brought to him for analysis he removed from the bottle a foreign product or object, which he described as "a small piece of stalk of plant." When asked, under cross-examination, whether this "small piece of stalk of plant" had deteriorated in the bottle and caused the contents to become unfit for human consumption, he testified that it did not; that there was no evidence of fermentation in the beverage; that the beverage itself has sugar, that the normal high acidity of the beverage, together with its carbon dioxide and some sodium benzoate, prevents fermentation.
Mr. Clay performed a routine toxicology on the liquid, testing it for heavy metals, organic poisons and chlorides. In each case the result was negative. He could find no trace of poison in the bottle. He also found no indication of fermentation or mold. The only positive finding Mr. Clay made was that the beverage was acid, which is normal for a fruit drink. His analysis of the contents convinced him there was nothing in the bottle that could cause harm to the human system.
Here we have only two experts, a pediatrician for plaintiff and a chemical analyst for defendants. There is no dispute that the child suffered some acute stomach disorder after eating the "hot dogs" and drinking the soft drink, but whether the stomach disorder was caused by the soft drink is the question. The pediatrician was not sure; but the chemical analyst, finding the contents free of any toxic or other deleterious substance, was sure the soft drink in question was not the offender.
A significant part of Mr. Clay's testimony is that the "small piece of stalk of plant" in the bottle appeared to have been deliberately compressed to insert it into the bottle. This piece of stalk could have been in the bottle when it was returned to defendant before being refilled; or, it could have been put in there by the plaintiffs after the occurrence. A description of the method of sterilizing and refilling bottles was described by defendant's superintendent. He outlined its three dippings in hot solutions of about 3% caustic soda, the insertion of small brushes to clean out foreign substances, and the constant vigil of employees checking the bottles as they come from the assembly line. He admitted that it was possible that something could escape the scalding and internal brushing, and the human detection, but such probability was 100 to 1.
However, the presence of this piece of stalk, whether it was in the bottle when consumed by the boy or later placed there by the parents, is not material, except for integrity. Dr. Wexler made no mention of having seen any foreign object in the bottle when she checked its contents with Litmus paper. There is no charge that the son saw the object or that it entered his mouth, or that any foreign object physically caused the trouble or disorder. It was only the bad taste and foul smell of the drink. Neither the mother nor the other children who smelled and tasted the same bottle suffered any stomach or other disorder.
*160 Conjectural view of the testimony leaves open the probability that the child had some brewing stomach or digestive disorder, or had "wolfed" his hot dogs and gulped the drink in such a way as to cause the gastroenteritis found by Dr. Wexler.
The law is well-settled that any processor, bottler or packager of food or drink, for human consumption, warrants it to be absolutely free from harmful or deleterious substances. However, the consumer must prove that the drink or food caused his illness, not merely make it conjectural. LeBlanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So.2d 873.
The positive testimony of the chemical analyst who made a thorough analysis of the residue of the bottle and the "small piece of stalk of a plant" is more conclusive and final than the testimony of the pediatrician, who, though properly diagnosing the symptoms as gastroenteritis, did not attempt to analyze the contents of the bottle, merely finding that the Litmus paper test showed acidity. Mr. Clay testified that all soft drinks are acid, but he did not find the contents of the bottle abnormally acid to a degree that it would cause illness or discomfort to the human body.
Judge Hamiter (on the Court of Appeal) in Hollis v. Ouachita Coca-Cola Bottling Co., Ltd., 196 So. 376, 378, clearly stated the rule as follows:
"Of course, in a suit of this nature the plaintiff must establish that the complaint or injury was proximately caused by the act or omission on which defendants' contended liability is predicated. Furthermore, the proof offered by the complainant should be carefully scrutinized, because the manufacturer usually has no means of disproving by eye witnesses the occurrence of the alleged accident; and this is particularly true when extreme care in the preparation of the bottle beverage has been shown, as in the instant case."
In the final analysis, it is not who put the plant stalk in the bottle, but whether it caused the child's stomach disorder. The child had no knowledge of it until after the stomach disorder occurred. Such a situation is quite different from that in which one, while drinking the contents of a bottle, suddenly feels some strange object in his mouth or sees it in the bottle, which is obviously a dead bug or the remains of an insect or animal. The very thought or sight of which is sufficient to cause nausea or other digestive disorder.
In the LeBlanc v. Louisiana Coca Cola Bottling Co., case, supra, the consumer, after consuming half of the contents of the bottle, felt a slimy substance in her mouth which she spat and put back in the bottle, after which she became nauseated and vomited.
In Miller v. Louisiana Coca-Cola Bottling Co., La.App., 70 So.2d 409, the laboratory tests revealed that the bottle contents included paint or a paint product.
In Ferguson v. Parr, La.App., 85 So.2d 117, pieces of bugs and insects were found.
In Rowton v. Ruston Coca-Cola Bottling Co., Ltd., La.App., 17 So.2d 851, the consumer when realizing there was foreign substance in his mouth spat it into a glass and discovered several dead flies.
In Morrow v. Bunkie Coca Cola Bottling Co., La.App., 84 So.2d 851, the laboratory report showed a brownish sediment, consisting of sand and clay, paper fibers, plant tissue, mold growth and trash.
In Laborde v. Louisiana Coca-Cola Bottling Co., La.App., 15 So.2d 389, the contents contained a large cockroach.
In White v. Louisiana Coca-Cola Bottling Co., La.App., 16 So.2d 579, various forms of foreign matter were found, and the court concluded the abnormal condition of the contents was due to fermentation.
In Mayerhefer v. Louisiana Coca-Cola Bottling Co., 219 La. 320, 52 So.2d 866, a chemical analysis showed free iodine in a *161 quantity one and a half times the maximum dosage for internal medicinal purposes.
Under the circumstances, we feel that plaintiffs have not sustained the burden of proof, but, to the contrary, the testimony of defendants' expert is convincing that the soft drink could not have caused the stomach disorder of plaintiffs' son. The judgment of the lower court is reversed, and plaintiffs' suit is dismissed, at plaintiffs' cost.
Reversed.