REID, Judge.
This suit was instituted against Louisiana Creamery, Inc. and its insurer, National Surety Corporation, by Mickey P. English, individually and as natural tutor for his minor child, Richard English, and by his wife Mrs. Maureen Rene English, for alleged damages caused their infant son as the result of drinking milk poured from a carton of “Lily” milk, a product of Louisiana Creamery, Inc., which Mrs. English had purchased from a Food Town, Inc. store located on Greenwell Springs Road in East Baton Rouge Parish.
Plaintiffs allege that on the afternoon of February 22, 1964, Mrs. English purchased a quart of “Lily” homogenized milk from Food Town for her eight months old son; that at approximately 9:30 on that same day the baby was placed in his bed and given a' bottle of the said milk, and about 30 minutes after he had gone to sleep the baby woke up screaming and vomiting; that plaintiffs checked the car *801 ton of “Lily” milk and found it had a foul and putrid odor and was rotten. They further allege that the baby was very sick all that night, which was a Saturday night, and the next day, Sunday, and was worse on Monday morning. They took the child to the Acadian Clinic where he was examined by Dr. Arlo W. Chavers who placed him in the Baton Rouge General Hospital and associated Dr. James L. Crump, a baby specialist. By Tuesday the baby was responding to treatment and on Thursday was released from the hospital. Their petition prays for $12,800.75 damages and expenses, and asks that they be permitted to file and prosecute the suit in forma pauperis.
The defendants filed a general denial to plaintiffs’ petition and an exception of no cause of action. They further filed a petition and application denying plaintiffs’ inability to pay the costs of their suit.
The case was tried on the merits and on January 28, 1965, judgment was rendered dismissing plaintiffs’ suit at their costs. The judgment was signed February 2, 1965. Plaintiffs moved for a new trial, which was denied, and plaintiffs appealed to this Court.
The Trial Judge gave no written reasons for judgment, nor were any reasons dictated into the record, despite the fact that in plaintiffs’ motion for a new trial they asked alternatively for written reasons for judgment for the purpose of appeal, as provided by Article 7, Section 43, of the Louisiana Constitution, and Article 1917 of the Code of Civil Procedure.
Counsel for plaintiffs argues that the Trial Court was in error in not applying the doctrine of res ipsa loquitur and in failing to hold that if the doctrine of res ipsa loquitur was not applicable, nevertheless the defendant creamery was bound by its warranty of wholesomeness which existed between it and consumers, which warranty was breached by Louisiana Creamery, Inc.
Although the Trial Judge did not favor this Court with reasons for his judgment, it is clear from the record that he must have felt the plaintiffs did not by preponderance of the evidence prove the defendant’s product was the cause of the alleged injuries sustained by their child.
The plaintiffs called two doctors to testify on their behalf, Dr. Arlo Chavers, a general practitioner, and Dr. James Leonard Crump, a pediatrician, both of Baton Rouge, Louisiana.
Dr. Crump was the first to testify. He said he was at the Baton Rouge General Hospital in Baton Rouge to see one of his own patients when Dr. Chavers called in and asked if a pediatrician were present and then talked to Dr. Crump and asked him to see the English child. Dr. Crump read the following from his report of February 24, 1964: “Vomiting and diarrhea for 24 to 36 hours with elevated temperature. Dehydration rather difficult to evaluate now because of obesity, but a doughy feel to anterior derma-wall suggests hypertonic dehydration of mild to moderate severity. Will try per os fluids and observe.” At the request of counsel for defendant he went on to read the balance of his report: “It is my understanding that the probable cause of this child’s illness was non-specific infection of unknown etiology. ‘Spoiled milk’ did not enter into the discussion.” He added that the latter was in a report to counsel for plaintiffs and “the reference to spoiled milk was because of the reference to this in this letter to me requesting information.” When asked what he meant by the words “non-specific infection,” Dr. Crump said he usually meant a virus. He was then asked:
“Q. Did the baby have a virus?
A. It was my understanding at this time that the baby had a virus.
*802 Q. How long did this condition last, or did you treat the baby?
A. I saw the baby on two occasions. The initial examination was at approximately noon of the day of admission, February 24, 1964, at which time this above note was written on the chart and I saw the baby again that evening, I would say around 5:00 or 5:30 and the baby was doing well at that time. I either saw or talked to Dr. Chavers, I don’t recall, but I told him that as far as I was concerned I didn’t feel that there was anything that I could add to his care of the baby and rather than continue on with the child, I didn’t feel like I was needed.
* * * * * *
Q. Doctor, you have outlined what his trouble was, vomiting and diarrhea for 24 to 36 hours with elevated temperature, exactly how bad off was this baby in lay language, in your opinion?
A. Well, in lay language the baby was not very sick.
Q. Not very sick?
A. No, sir.
Q. Was there any time at all you thought he might die from this?
A. No, sir. I might add, if this is . all right, again this is an understanding and I don’t know this to be true. But the baby was receiving fluids through a mode that’s called dermoclisis, which is fluids in the skin itself. At the time I first saw the baby the baby was lying and restrained with two drips going into the skin. And in that position the baby looked quit ill. After a cursory exam I asked the nurse to stop the drips so I could sit the baby up, or child, I guess it is, and do a little further examination. It was at that time that this note that I did not feel that the child was sick enough not to be able to retain liquids by mouth. And this was started and the child did retain liquids.”
He further testified in regard to the cause of the illness, that as far as this child was concerned, the question of spoiled milk never entered into the history nor talks with the parents. He stated: “I have never knowingly seen a child who was sick from spoiled milk.” He said spoiled milk has a distinct odor and taste and it would not be unusual for a baby to refuse to take it, especially out of a bottle with a nipple. Dr. Crump also stated: “If the milk was bad enough to make the baby sick, I would think that the baby would refuse it.” He further testified that the baby was obese, somewhere between 25% and 50% above ideal weight. It was brought out in testimony that although this child was 8 months old he was still solely on a milk diet, and Dr. Crump was asked:
“Q. Would you consider that a child eight months of age, solely on a milk diet, would be under a condition detrimental to his physiological needs?
A. Yes, I would consider him malnourished.
Q. You would consider the child malnourished?
A. Yes.
O. Would this malnutrition in any way affect the constitution of the child insofar as fighting off infections, viruses, or matters which were, not perfect you might say, for consumption.
A. We believe so, yes.”
*803 He also said a cold would make the child more susceptible to the causes of diarrhea and vomiting which were the manifestations of said illness. Dr. Crump was asked how long it would normally take for spoiled, putrid or rotten milk consumed by an 8 months old baby to actually manifest itself in a bowel movement known as diarrhea and he answered:
“A. Well, if the substance were an irritating substance causing a hyperemotivity of the bowel, probably as soon as a couple of hours. If the substance was nonirritating within probably — in an eight-month old baby, probably twelve hours.”
The doctor was further asked:
“Q. Doctor, in your opinion, is it more probable or is it less probable that the symptoms suffered by this child were caused by spoiled milk, the symptoms suffered by this child ?”
and he answered:
“A. Less probable, if the choice were less probable than more probable, I would say less probable.”
On redirect examination, Dr. Crump further stated that for sour milk to cause diarrhea it would take two hours or more. In answer to question by the Court, Dr. Crump was most emphatic that even assuming the milk did make the child sick, it would not be the cause of an illness some four to six months later.
The other doctor who examined the child, Dr. Arlo Chavers, testified that he saw the child on February 24, 1964 (two days after the baby allegedly drank spoiled milk) in his office and he felt at that time the child was fairly critical and appeared to be cyanotic, having difficulty breathing. He rushed the child to the Baton Rouge General Hospital where the child was given fluid and antibiotics and oxygen. His diagnosis on admission was dehydration primarily, and that he had a cyanosis from an upper respiratory infection and poor oxygen exchange. He further testified that the child had a cold, his breathing was unusual — which he assumed was caused from the cold, and that the child had a temperature of 103 degrees. Dr. Chavers further testified that when he saw the baby shortly after he was admitted to the hospital he was not as sick as Dr. Chavers had presumed when he first saw the baby in his office when he “thought the baby was critically ill, and again I point out that this was a hurried, very hurried thing, because in the office I am not set up to take care of an infant that’s sick, as no one else is, so we did not hesitate in the office with this baby, we moved him right on out to the hospital.”
With reference to this 8 months old baby’s diet of nothing but milk, Dr. Cha-vers testified:
“A. I don’t recommend that any children stay on just milk, not even at two months of age.
Q. Does it adversely affect their health ?
A. I think it would, yes, I think that they would be anemic.”
Dr. Chavers testified that his diagnosis was diarrhea of unknown etiology and despite repeated questioning by plaintiffs’ counsel, he would not testify that the child’s illness was caused by what is known as ordinary spoiled milk. Again, on cross examination, Dr. Chavers was definite in his testimony that he did not think ordinary spoiled milk would cause illness as in this case and stuck to his diagnosis of iteology unknown. He said it was a reasonable assumption that an ailment such as a cold, or an ailment which would result in diarrhea and vomiting, would more likely occur *804 in an anemic child rather than in a child that was not anemic. He also testified that in order to know the effects of drinking the milk it would have been necessary to have the milk analyzed and he was asked:
“Q. In effect you are saying, to determine what was the cause of this baby’s illness in relation to the milk is speculative, purely speculative.”
and he answered:
“A. That’s all.”
At no place in Dr. Chavers’ testimony is there any indication that at the time he first examined the English child the parents gave any history of the child having swallowed spoiled milk. In fact an examination of the testimony of both doctors cast great doubt upon the plaintiffs’ contention that the cause of the child’s illness was the drinking of spoiled milk. Neither doctor testified that at the time they took the history of the baby’s illness the parents mentioned spoiled milk. The doctors testified the baby was dehydrated, was apparently anemic, and suffered from a cold and possibly virus, and both doctors felt that spoiled milk was the least probable cause of the baby’s condition.
It is certainly significant that even though both doctors were called as plaintiffs’ own witnesses, the counsel for plaintiffs almost completely ignored their testimony in his brief, limiting his discussion of their testimony to one very short paragraph. He apparently attempts to rest his case on the lay testimony, but this Court does not feel that the lay testimony in this case is sufficient to overcome the testimony of the medical experts.
It is hornbook law that in order to prove negligence the plaintiff must prove by preponderance of the evidence that the negligence alleged caused the injury sustained. This rule of law applies to food products liability cases in the same manner as other negligence cases.
In the case of Walker v. American Beverage Company, La.App., 124 So.2d 157, the Court said:
“The law is well-settled that any processor, bottler or packager of food or drink, for human consumption, warrants it to be absolutely free from harmful or deleterious substances. However, the consumer must prove that the drink or food caused his illness, not merely make is conjectural.”
and cited with approval the case of Hollis v. Ouachita Coca-Cola Bottling Co., Ltd., La.App., 196 So. 376, wherein the Court clearly stated the rule as follows:
“Of course, in a suit of this nature the plaintiff must establish that the complaint or injury was proximately caused by the act or omission on which defendants’ contended liability is predicated. Furthermore, the proof offered by the complainant should be carefully scrutinized, because the manufacturer usually has no means of disproving by eye witnesses the occurrence of the alleged accident; and this is particularly true when extreme care in the preparation of the bottle beverage has been shown, as in the instant case.”
It is the view of this Court that the plaintiffs have not established a causal relation between the child’s illness and the milk. Because of that finding, we do not think it necessary to go into the question of the doctrine of res ipsa loquitur and breach of warranty.
For the above and foregoing reasons, the judgment of the District Court is affirmed.
Affirmed.