**LIBERTY MUTUAL FIRE INSURANCE COMPANY**

**v.**

**TIDEWATER OIL COMPANY et al.**

**Civ. A. No. 10741.**

United States District Court
W. D. Louisiana,
Lafayette Division.

June 30, 1967.

**819**

Davidson, Meaux, Onebane & Donohoe, John G. Torian, III, Lafayette, La., for plaintiff.

Chaffe, McCall, Phillips, Burke, Toler & Sarpy, Leon Sarpy, New Orleans, La., for defendants.

## MEMORANDUM OPINION

PUTNAM, District Judge.

This case is the aftermath of a blowout and fire occurring in the Port Barre Oil Field, in St. Landry Parish, Louisiana, on January 25, 1964 at the site of an oil well being drilled by Trahan Drilling Company and designated as the Marks No. 1 Well. Following the fire, plaintiff, Liberty Mutual Fire Insurance Company paid the owner of the drilling rig its appraised value of $287,662.00 and brings this suit as subrogee for that amount with interest and cost.

The initial defendants were Tidewater Association Oil Company, J. C. Trahan Drilling Company, Inc., Schlumberger Well Surveying Corporation and the present defendant, United States Steel Corporation (USSC). Various grounds of negligence on the part of these defendants were alleged, the claim against USSC being predicated on the theory that the casing used in the well failed at the time the well was perforated from a defect therein under the tort doctrine sometimes referred to as "strict liability". Plaintiff also seeks recovery on grounds of negligence (LSA–C.C. Article 2315) and the doctrine of res ipsa loquitur. All defendants except USSC were released following compromise with plaintiff and the matter was tried to the Court without the intervention of a jury.

Our jurisdiction attaches under Title 28 U.S.C.A. § 1332, there being diversity of citizenship and jurisdictional amount. At this point, we note that this Court is sitting as an "Erie Court" in the state of Louisiana, and is accordingly governed by the law of this state.[1]

The well had been drilled to a depth of 10,640 feet and the casing set preparatory to completion. The evidence in the case, while raising some question as to the identity of the particular joint claimed to have failed, establishes to the satisfaction of the Court that it was four and one-half inch tubular casing manufactured by defendant USSC. Schlumberger was on the scene for the purpose of perforating the well and the perforating gun had been lowered into the hole. Robert Penn, assistant superintendent for Trahan, was in charge of the operation. The Eggleston rig and crew were also on the scene engaged by Trahan on a day-work basis. Both Penn and J. C. Carpenter, Eggleston's tool pusher, were in a shelter provided at the well for coffee and consultation purposes whenever necessary. The well was perforated and, when the gun was being removed, mud began to escape from the perforating nipple. It was then apparent that the well was coming in and Carpenter and Penn were called. Carpenter gave the order to close the well in as soon as the perforating gun rattled in the shooting nipple. The blind rams were closed. Carpenter and a roughneck went below the derrick floor and as they stooped to go under there was a sound like an explosion and mud began shooting up from what appeared to Carpenter to be some point under the bradenhead. Thereafter, a second explosion followed and the well caught fire.

There is some conflict in the testimony of Carpenter and Penn. Penn stated that after the blind rams were closed and the well shut in, he saw someone, later found to be a member of Eggleston's crew acting under instructions from Carpenter, open a valve on the choke manifold. It should be noted that leading from the choke manifold are two

1. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

two-inch flow lines, about eight feet apart and three or four feet above the ground, which are used to control the mud in the well. It was at this moment that Penn saw both two inch flow lines blow, one at the "L" connection and one at the collar below the "L", with the resultant effect of oil, gas, and mud shooting forward under the super structure hitting a light bulb; the other blew towards the engines. The fire occurred almost immediately after the lines blew. The derrick collapsed toward the hottest part of the fire, this being opposite the engine side. Penn stated that the fire had a spread of approximately fifty feet. Penn was also one of the five men who went into the fire behind a shield provided by the Red Adair Fire Fighters and testified positively that the fire was not coming from below the bradenhead at all, this being the location of the alleged break in the four and one-half inch casing.

The casing in question was supporting a superstructure weighing approximately five thousand pounds, which had to be removed in order to control the fire. This was accomplished by the use of a special hook and wire rope attached to the casing and to two bulldozers. Pulling in tandem with this equipment, the crew caused the superstructure to topple over. It is uncontradicted that the casing showed a very smooth transverse break that could possibly have been caused by the pull of the two bulldozers. It should be noted that except for the portion of the casing which was above the ground, removed because of the break, the remainder of the casing is still in the well which is operating today.

The testimony of other witnesses and experts give a variety of reasons and explanations for the blow out, some of these reasons being that the mud weight was too light to control the well; that the "swabbing" action caused by Schlumberger pulling out its perforating tool too fast, caused excessive internal pressure and created a suction resulting in the blowout; that the casing could have

failed due to faulty installation, not necessarily from a defect in the casing itself, indicated by the fact that there was no longitudinal break in the casing such as would result from internal pressure.

The plaintiff places principal reliance on the doctrine of "strict liability" or "implied warranty" imposed upon the manufacturer. In the recent decision of Lartigue v. R. J. Reynolds Tobacco Co., 317 F.2d 19 (5 Cir. 1963), the theory was summed up as follows:

"Under the doctrine of strict liability it is not necessary for the plaintiff to show that the defendant failed to use due care or that the defendant had knowledge of the defective condition. However, it *is* necessary to show that *the warranted product contained an element from which, on the basis of existing human knowledge, harm might be expected to flow*". (Emphasis supplied.) 317 F.2d 19, at p. 35.

See also, Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4, 1962) and the more recent case of Meche v. Farmers Drier & Storage Company, 193 So.2d 807 (La.App. 3, 1967) writ refused 250 La. 369, 195 So.2d 644, 1967. In *Samaha*, supra, the Court quoted from the earlier decision of Gordon v. Bates-Crumley Chevrolet Company et al., 158 So. 223 (La.App. 2, 1935), affirmed 182 La. 795, 162 So. 624 (1935), as follows:

"In all these cases it was established to the satisfaction of the judge or jury that the injury to the purchaser was due to original defects in construction, material, or workmanship, of the car in question." 158 So. 223, at p. 231

In this case, the plaintiff failed to offer any direct proof whatever that the casing contained a defect which caused it to fail, while in its normal and intended use; or that the failure was proximately caused by an act or omission on the part of the defendant. Samaha v. Southern Rambler Sales, Inc.,

supra; Meche v. Farmers Drier & Storage Company, supra; Lee v. Smith et al., 168 So. 727 (La.App. 1, 1936); Hollis v. Ouachita Coca-Cola Bottling Co., Limited, 196 So. 376 (La.App. 2, 1940); Walker v. American Beverage Co., 124 So.2d 157 (La.App. 4, 1960). Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities. Hopkins v. Louisiana Ry. & Nav. Co., 152 La. 13, 92 So. 717 (1922); Tolle v. Higgins Industries, 212 La. 173, 31 So.2d 730 (1947).

The only testimony favorable to plaintiff is that of Carpenter, who stated that he saw mud and gas coming up from a point that appeared to him to be under the bradenhead. He concluded that the casing had split. This in no way proves that a defect existed, however. Even the testimony of plaintiff's expert witness, Mr. Fred Bates, a prominent consulting petroleum engineer and geologist, fails to establish that a defect existed. Mr. Bates stated that he was of the opinion that the casing failed, but that its failure could have occurred from a defect or from faulty installation. However, the Court is particularly impressed with the eye witness testimony of Penn who positively stated that he observed the fire during its burning stage with the Adair crew, and noted that the blaze was not coming from below the bradenhead. Under the circumstances, we feel that the evidence preponderates to the effect that there was no defect in the casing itself at the time of its delivery to the well site. The apparent break in the casing was most probably caused by the pull of the bulldozers when the superstructure was removed, and the intense heat generated by burning gas under a pressure of approximately 4000 pounds per square inch, escaping upward, resulted in the upward flow of molten metal observed by Mr. Bates and Mr. Copeland.

Under these facts, and assuming that the doctrine of "strict liability" would be applied in Louisiana to the manufacturer of hard metal goods for industrial purposes, a doubtful assumption but one most favorable to plaintiff, the plaintiff has failed to sustain the burden of proof necessary for its application.

Plaintiff also urges application of the doctrine of res ipsa loquitur. It is settled in our jurisprudence that for the doctrine of res ipsa loquitur to apply, the plaintiff must prove that the accident was one that ordinarily would not occur in the absence of negligence and also that the agency causing the accident was in the exclusive control of the defendant. Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (1957); Williams v. U. S. Royal Tires, 101 So.2d 488 (La.App. 1, 1958); National Surety Corporation v. Travelers Insurance Company, 149 So.2d 438 (La.App. 3, 1963); see also the concurring opinion of Justice Sanders in Pilie v. National Food Stores of Louisiana, Inc., 245 La. 276, 158 So.2d 162, at page 171 (1963).

In the instant case, the casing had been routed from the factory of USSC to a supplier, Mid-Continent Supply Company, who stocked and stored the casing at the yard of T. E. Marcet in Vidalia, Louisiana. Upon orders from Mid-Continent Supply, T. E. Mercer Trucking Co. transported the casing to the wellsite. It was installed later by Eggleston, assisted by Griffith Rental Tools, and the bradenhead was welded to it by still another party. USSC had no control over the casing after it left the factory and at no time did they have a representative at the wellsite. Plaintiff's own expert testified that the casing could have failed due to faulty installation. The casing in question was never in the exclusive control of USSC after it left the factory and even if it actually failed, this could have been caused by any of several intermediate steps in its handling and installation. Under these circum-

stances, the doctrine of res ipsa loquitur does not apply.[2]

■ We believe it unnecessary to go into the question of negligence on the part of the defendant. A review of the entire testimony and evidence given in plaintiff's case fails to reveal any act or omission which would cause this action to fall within LSA–C.C. Article 2315.

Judgment is rendered in favor of defendant.

---

**2.** Since rendition of the foregoing opinion the decision of Arnold v. United States Rubber Company, 203 So.2d 764 (La.App.

3rd Cir., Nov. 27, 1967) has been handed down. This case is squarely in point here.