Victoria St. Pierre LARTIGUE,
Appellant,

v.

R. J. REYNOLDS TOBACCO COMPANY
and Liggett and Myers Tobacco
Company, Appellees.

No. 18903.

United States Court of Appeals
Fifth Circuit.

April 19, 1963.

H. Alva Brumfield, Baton Rouge, La., Melvin M. Belli, Sr., San Francisco, Cal., Sylvia Roberts, Baton Rouge, La., for appellant.

Harry B. Kelleher, Harry McCall, Jr., New Orleans, La., Frederick P. Haas, Theodore Kiendl, Porter R. Chandler, Edwin J. Jacob, New York City, for appellees.

Before HUTCHESON, RIVES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

■ The Court's decision on this appeal turns on the nature and scope of a cigarette manufacturer's warranty of its product. The plaintiff's husband, Frank J. Lartigue, died of cancer. The complaint alleges that the cancer came from smoking the defendants' tobacco products, Picayune cigarettes and King Bee tobacco, manufactured by Liggett & Myers, and Camel cigarettes, manufactured by Reynolds.[1] The plaintiff bases her claim on breach of warranty and negligence. The defendants pleaded a general denial, contributory negligence, and assumption of risk. After a long trial, the jury gave a general verdict for the tobacco companies. The plaintiff appeals, mainly on the ground that the trial judge erred in not instructing the jury properly on the defendants' implied warranty of wholesomeness, a warranty distinct from the warranty against hidden vices implied in every sale as provided in the Louisiana Civil Code. This is a diversity suit; Louisiana law controls the case. We affirm.

## I.

Frank J. Lartigue, a resident of New Orleans, started smoking Picayunes in 1899 when he was nine years old. He continued to smoke Picayunes and also King Bee tobacco for 55 years until October 5, 1954, when he was operated on for cancer of the larynx. In 1944 he began smoking Camels, along with King Bee and Picayunes. His wife, who married him in 1917, testified that he was a "cigarette fiend." As long as she knew him he smoked at least two packs a day, lit one cigarette from another, and smoked them down to small butts. As early as 1934, "all the doctors" had advised him not to smoke. October 5, 1954, Lartigue was operated for cancer of the larynx. The larynx, all of the right vocal cord, and part of the left vocal cord were removed. Medical reports showed that he had a squamous cell cancer and evidence of leukosplahia. He was discharged from the hospital October 12, 1954. December 12 he returned to the hospital; he had lung cancer. He remained in the Ochsner Clinic Foundation Hospital in New Orleans until February 25, 1955, and then entered the Veterans Hospital in Houston, June 21. There he died July 13, 1955, in his sixty-fifth year. An autopsy showed that the cause of death was carcinoma of the right lung, with extension to chest wall and suppression of superior vena cava.

Lartigue's long medical history shows that for over thirty-five years he was physically weak, racked by coughing and a sore throat. His army records reflect that he had measles, pertussis, and diptheria as a child; malaria in 1917; influenza in 1918; chronic tonsilitis, pyorrhea, and muscular pain; gonorrhea in 1910 and tertiary syphilis in 1918. Later, he had tuberculosis. Lartigue had rheumatism as early as 1934. He had all of his teeth pulled. The plaintiff offered evidence that none of these ills cause or aggravate cancer; the defendant countered with evidence that, except for rheumatism, all of these ills aggravate and are suspected causes of cancer.

■ The plaintiff contends that the jury's verdict was contrary to the manifest weight of the evidence. The record consists of twenty volumes, not to speak of exhibits, most of it devoted to medical opinion. The jury had the benefit of chemical studies, epidemiological studies, reports of animal experiments, pathological evidence, reports of clinical observations, and the testimony of re-

---

1. The Irby Branch of the old American Tobacco Company, not a defendant in the case, manufactured King Bee tobacco and Picayune cigarettes until 1911. Liggett & Myers was incorporated upon the dissolution of the old American Tobacco Company.

nowned doctors. The plaintiff made a convincing case, in general, for the causal connection between tobacco and cancer and, in particular, for the causal connection between Lartigue's smoking and his cancer. The defendants made a convincing case for the lack of any causal connection. The district judge, in the course of the hearing on the plaintiff's motion for a new trial, expressed the view:

"I regret now I did not propound the interrogatory with respect to the connection between the smoking and his lung cancer because I'm satisfied the jury never got beyond that question and I know—I'm sure at least that they simply decided the plaintiff had failed to prove the causal connection between his smoking and his lung cancer but that is water under the bridge now."

We consider it unnecessary in this opinion to summarize the evidence. We find substantial evidence in the record to support the verdict.

## II.

The appellant's central attack on the trial judge's charge is that the instructions on the nature of implied warranty were contrary to Louisiana law. The appellant's flank attack is that the instructions on warranty were so interspersed with principles of negligence as to be misleading.

The appellant relies on the following extract from the charge, quoting the underscored language to support her main attack:

"I will give this special charge, 30: Plaintiff also claims that the Defendants are liable to her for the death of her husband because, as she contends, their products caused or contributed to the causing of cancer from which he died, and thereby, breached the warranty of general quality which is implied by Louisiana law in every sale. The warranty of general quality which is implied by Louisiana law is only as to those qualities of which a manu-

facturer can have knowledge in the exercise of reasonable diligence, the absence of which causes damage that is reasonably foreseeable.

"The manufacturer of products which are offered for sale to the public in their original package for human consumption or use, impliedly warrants that its products are reasonably wholesome or fit for the purpose for which they are sold. But such implied warranty does not cover substances in the manufactured products, the harmful effects of which no developed human skill or foresight can afford.

"You are instructed that the manufacturer who makes a product is under a duty first to exercise reasonable care in testing and inspecting its finished product to determine whether such products are reasonably safe for their intended use. And if he fails to do so and injury proximately results, he in such instance would be liable for the injury. A party is liable for all the consequences which reasonably flow from or follow the wrongful act, if they be established. Whether actually contemplated or not, and the wrongful act being established, the liability extends to all the consequences that naturally and proximately flow from such act.

"If you find that at the time Mr. Lartigue's cancer started, the cigarettes manufactured by the defendants were usable as such, and that the state of medical knowledge was then such that the defendants could not have anticipated in the exercise of reasonable care that their products would cause cancer, then your verdict on the issue of implied warranty, would be in favor of the defendants.

"Now, in weighing the actions of the defendants and plaintiff's deceased husband, Frank Lartigue in this case, in so far as negligence on the part of the defendants and contributory negligence and assump-

tion of the risk on the part of the plaintiff is concerned, you should consider that even if defendants did not know of the dangerous substances in their products, you should consider from the evidence whether they should have taken steps to ascertain the effects of their products when used for human use, especially as to whether their products would cause or be a contributing cause in the development of cancer of the lung and larynx."

Considering the charge as a whole, we find that the trial judge explained to the jury that the action was based both on negligence and on breach of warranty and that he correctly differentiated between the two claims. After the usual general instructions, the trial judge, in three pages of printed text, instructed the jury on the elements of negligence. In about a page of printed text he explained contributory negligence. In these instructions the trial judge made no reference to warranty. Next he made it clear to the jury that having completed the instructions on negligence he would then instruct on breach of warranty. At this point he gave the instructions we have quoted.

It is true that such terms as "knowledge", "reasonable diligence", "reasonably foreseeable", "reasonably fit" and "reasonable care", which the trial judge employed in his instruction on warranty, are ordinarily associated with negligence. But they are also prop-erly used when recovery is sought against a manufacturer on the ground of breach of warranty. These terms define the nature and scope of a manufacturer's so-called "warranty" (law-imposed duty) to consumers. The trial judge used them properly. "Liability in warranty arises where damage is caused by the failure of a product to measure up to express or implied representations on the part of the manufacturer or other supplier. * * * [It] is strict if a breach thereof is proved." 1 Frumer & Friedman § 16.01 [1] (1961). The liability on warranty that a consumer invokes against a manufacturer, with whom he has no contract of sale, is delictual, a liability in tort; in Louisiana in the case of food products and other articles intended for human consumption, it is strict liability regardless of fault. This is a heavy burden on a manufacturer, but it is a liability only for a defective condition not contemplated by the consumer, the harmful consequences of which, based on the state of human knowledge, are foreseeable. "The foreseeability here involved is different from that required in negligence cases. It is not the foreseeability of unreasonable risks, but rather the foreseeability of the kinds of risks which the enterprise is likely to create." James, Strict Liability of Manufacturers, 24 Tenn.L.Rev. 923, 925 (1957). Further discussion will clarify our views.

A. First, it is helpful to take a quick look at the manufacturer's liability[2] as the law has developed in other states.

2. Legal writings on the subject are prolific. See especially Perkins, Unwholesome Food as a Source of Liability, 5 Iowa L.Bull. 6 (1919); Llewellyn, on Warranty of Quality, and Society, I, 36 Col.L.Rev. 699 (1936); II, 37 Col.L.Rev. 341 (1937); Jeanblanc, Manufacturers' Liability to Persons Other Than Their Immediate Vendees, 24 Va.L.Rev. 134 (1937); Prosser, The Implied Warranty of Merchantable Quality, 27 Minn.L.Rev. 117 (1943); James, Products Liability, 34 Tex.L.Rev. 44, 192 (1955); James, Green, Plant, Lucey, Noel, Symposium, Strict Liability of Manufacturers, 24 Tenn.L.Rev., Spring, 1957; Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1959); Patterson, Manufacturer's Statutory Warranty: Tort or Contract, 10 Mercer L.Rev. 272 (1959); Keeton, Products Liability-Current Developments, 40 Tex.L.Rev. 193 (1961); Comment, 27 Mo.L.Rev. 194 (1962). In general, see Melick, The Sale of Food and Drink (1936); 1 Williston, Sales § 241–243 (Rev. Ed. 1948); Dickerson, Products Liability and the Food Consumer (1951); Prosser, Torts § 84 (2d Ed. 1955); 2 Harper & James, Torts, § 28 (1956); Frumer and Friedman, Products Liability (1961); Hursh, American Law of Products Liability (1961). See also Restatement of Torts, Second § 402(A) Tent. Draft No. 7 (1962).

In the common law, traditionally, the doctrine of caveat emptor [3] and the requirement of privity between the seller and buyer freed a manufacturer of liability to a remote user or consumer. Winterbottom v. Wright, 1842, 10 M. & W. 109, 152 Eng.Rep. 402. The "citadel of privity" [4] was first successfully stormed in negligence actions against manufacturers involving inherently dangerous instrumentalities. In a watershed decision, Judge Cardozo stated the modern rule in affirmative terms of liability rather than in terms of a negative rule of nonliability to which an exception must be found: if a manufacturer's product "is reasonably certain to place life and limb in peril when negligently made," the manufacturer is liable to consumers, even if there is no privity. MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696. When the claim is based on breach of *implied* warranty in a *non-food case*, lack of privity is generally a defense. [5] One engaged in the business of selling a product by advertising, however, may be liable on *express* warranty to a consumer injured by relying upon a misrepresentation in the advertising. Baxter v. Ford Motor Co., 1932, 168 Wash. 456, 12 P.2d 409, 15 P.2d 1118, 88 A.L. R. 521.

When a claim is based on injuries from *food products manufactured* or processed for human consumption a special rule prevails in a large majority of the states: strict liability, with or without privity, regardless of negligence. [6] In recent years a number of courts have extended the rule of strict liability to articles "for intimate bodily use", such as cosmetics, chewing tobacco, cigarettes, drugs given by injection, and similar products. Thus, the American Law Institute has approved a new section in the Restatement of the Laws of Torts Second which is couched in non-contractual phraseology:

"§ 402A. *SPECIAL LIABILITY OF SELLERS OF PRODUCTS FOR INTIMATE BODILY USE*

"ONE ENGAGED IN THE BUSINESS OF SELLING FOOD FOR HUMAN CONSUMPTION OR OTHER PRODUCTS FOR INTIMATE BODILY USE, WHO SELLS SUCH A PRODUCT IN A DEFECTIVE CONDITION UNREASONABLY DANGEROUS TO

---

3. See Hamilton, The Ancient Maxim Caveat Emptor, 40 Yale L.J. 1133 (1931). Hamilton points out, however, that in the common law food vendors have long been held to a special responsibility when they failed to exercise the degree of skill prevailing in their trade. The ale-wife who sold weak beer "journeyed to the tumbrel with distaff and spindle".

4. "The assault upon the citadel of privity is proceeding in these days apace." Justice, then Judge, Cardozo in Ultramares Corp. v. Touche, 1931, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139.

5. For example: "[T]here is no contractual relation existing between the original seller, the warrantor, and a subpurchaser. They are unknown to each other in the transaction." Pease & Dwyer Co. v. Somers Planting Co., 1922, 130 Miss. 147, 93 So. 673.

6. The Restatement of Torts Second, Tentative Draft No. 7, 1962, lists the following nineteen jurisdictions as sup-

porting the rule of strict liability for food and drink: Arizona, California, Florida, Illinois, Iowa, Kansas, Louisiana (citing LeBlanc v. Louisiana Coca Cola Bottling Co., 1952, 221 La. 919, 60 So. 2d 873; Miller v. Louisiana Coca-Cola Bottling Co., La.App.1954, 70 So.2d 409; Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Texas, Virginia and Washington. The following five states reach the same result under statutes which provide for strict liability, or are construed to have that effect: Connecticut, Georgia, Minnesota, Montana, and South Carolina. The following eleven jurisdictions reject the rule: Alabama, District of Columbia, Kentucky, Maine, Massachusetts, New Hampshire, North Carolina, Rhode Island, South Dakota, West Virginia, and Wisconsin. In the remaining fourteen states the law is not definite as to food products liability. No state has rejected the rule since 1935; since 1935 ten states have adopted the rule.

THE CONSUMER, IS SUBJECT TO LIABILITY FOR BODILY HARM THEREBY CAUSED TO ONE WHO CONSUMES IT, EVEN THOUGH

"(a) THE SELLER HAS EXERCISED ALL POSSIBLE CARE IN THE PREPARATION AND SALE OF THE PRODUCT, AND

"(b) THE CONSUMER HAS NOT BROUGHT THE PRODUCT FROM OR ENTERED INTO ANY CONTRACTUAL RELATION WITH THE SELLER."

Courts have had little trouble in holding a seller of foods strictly liable to the ultimate consumer; it has not been so simple to rationalize the result. From time to time courts have based recovery on a contract for the benefit of a third person, an agency relationship between an intermediate dealer, wholesaler or retailer, and the consumer, and an implied representation of fitness.[7] Until recently, the most popular theory based recovery on an implied warranty running with the goods similar to a covenant running with the land. This theory has many obvious difficulties, the most serious of which is the confusion caused when the useful fiction of a warranty to explain an action for damages in tort is sought to be applied literally as if it were indeed a covenant inseparable from a contract of sale. That confusion permeates the thinking of the parties in this case: the plaintiff considers that the warranty, like a warranty of title to real estate, covers all possible defects; the defendants resolutely insist that the only warranty in Louisiana is the contractual warranty against redhibitory vices implied in every sale. The view now generally accepted by common law authorities is that the "warranty" is not contractual but is strict liability in tort, independent of negligence.[8] The explanation is consistent with the history of warranty. "The action for breach of warranty was originally one on the case, sounding in tort and closely allied to deceit, from which it was not distinguished."[9] The Comment to Section 402A of the Restatement of Torts Second, Tentative Draft No. 7 (1962), states, in part:

" 'Warranty.' The liability stated in this Section does not rest upon negligence. It is strict liability, similar in its nature to that covered by Chapters 20 [Liability of Possessors of Wild Animals] and 21 [Liability for Abnormally Danger-

7. For a collection of twenty-nine examples of what Dean Prosser calls (60 Yale L.J. 1099, 1124) "a remarkable variety of highly ingenious, and equally unconvincing theories of fictitious agency, third-party-beneficiary contract, and the like to get around the lack of privity" see Gillam, Products Liability in a Nutshell, 37 Ore. L.Rev. 119, 153 (1957).

8. Ames, The History of Assumpsit, 2 Harv.L.Rev. 1 (1888); Williston, Sales § 195 (1948); Melick, The Sale of Food and Drink 8 (1936); Dickerson, Products Liability and the Food Consumer 34 (1951) ; Prosser, Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, (1960), Restatement of the Law of Torts Second § 402A, Tent.Draft No. 7 (1962).

9. Prosser, Assault Upon the Citadel, 69 Yale L.J. 1099, 1126 (1960).
"[I]t was not until 1778 that the contract action was held to lie at all. It is undisputed that the original tort form of action, as on the case, still survives to the present day, and may everywhere be maintained. Nor is this a mere technical matter of procedure, since there are many decisions which have held that the tort aspects of warranty permit the application of a tort rather than a contract rule, in such matters as the survival of actions, the statute of limitations, the measure of damages, or recovery for wrongful death. Beyond this, the old tort character has continued to color the substantive law of warranty itself, by perpetuating the idea of a misrepresentation of fact, however innocent, and of a liability arising and imposed by operation of law, which is quite independent of any intention to agree upon terms as a matter of fact. Thus there are a great many cases, even between the immediate parties, in which to say that the warranty is a term of the contract is 'to speak the language of pure fiction.' " Ibid.

ous Activities] of this Restatement. The basis of liability is purely one of tort. * * *

"Although warranty was in its origin a matter of tort liability,' and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. If the rule stated in this Section is to be treated as one of *'warranty'* to the consumer, it is at least a very different kind of warranty from those usually found in the sale of goods, and it is not subject to the various contract rules which have grown up to surround them." [10]

---

**10.** The Comment continues:

"The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill or judgment of the seller who is to be held liable, nor any representation or undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to 'buyer' and 'seller' in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from when he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the hands of the consumer. In short, 'warranty' must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here settled as merely one of strict liability in tort."

In food products cases Louisiana courts have reached the same result as courts in most common law states. In doing so Louisiana courts have relied on common law authorities about as often as on civilian authorities.[11] We turn now to Louisiana law.

B. Louisiana courts, unlike common law courts, have no difficulty in finding an implied waranty when the defendant is the seller: the LSA–Civil Code implies a warranty in every sale. Article 2475 provides: "The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells." This obligation resulting from the sale is similar to the warranty in the Uniform Sales Act and the Uniform Commercial Code.[12] Thus, the Civil Code deals with the subject in Chapter 6, "Of

Dean William L. Prosser is the Reporter for the Restatement. The Advisers are: Laurence H. Eldredge, Gerald F. Flood, Fleming James, Jr., Robert E. Keeton, W. Page Keeton, Calvert Magruder, Wex Smathers Malone, Clarence Morris, Warren A. Seavey, Samuel D. Thurman, Jr., Roger J. Traynor, and John W. Wade.

**11.** See especially LeBlanc v. Louisiana Coca Cola Bottling Co., 1952, 221 La. 919, 60 So.2d 873.

**12.** "[W]hile there are differences between the two systems in the treatment of some situations, the basic principle behind both is the same." Fazio, A Comparison of Redhibition in Louisiana and the Uniform Commercial Code, 19 La.L.Rev. 165. See also Dickerson, Products Liability and the Food Consumer 44–63 (1951). Cf. the Restatement comment quoted in footnote 10.

Section 15 of the Uniform Sales Act provides for warranties of (1) fitness and (2) merchantability. In all sales: "(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. (2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied

the Obligations of the Seller", Articles 2476–2548, in the title "Of Sales".

The warranty is two-fold. Article 2476 provides: "The warranty respecting the seller has two objects; the first is the buyer's peaceable possession of the thing sold, and the second is the hidden defects of the things sold or its redhibitory vices." [13] The defendants assert that the plaintiff must find relief in the Code and that the only warranty the Code provides "for hidden defects of the things sold" is the sales warranty described in the articles on redhibition.

The scope of the codal warranty against redhibitory vices is stated in terms of fitness for intended use. [14] The defendants therefore argue that the basic question is whether their cigarettes were fit for smoking. They say that their cigarettes are *established products* made from commercially acceptable or superior tobacco having no quality differentiating it from tobacco in other commercially acceptable cigarettes. Historically, in Louisiana such products comply with the warranty of quality if they meet the standards of comparable products and are suitable for the use for which they are bought. The plaintiff contends that independent of the warranty of "quality"

or "fitness for use" implied in every sale, a seller or manufacturer of products for human consumption warrants the *wholesomeness* of such products. There are material differences in legal theory between the two warranties. In this case, however, where the defendants have chosen to ignore the defensive possibilities of the contractual aspects of the warranty against redhibitory vices and where the intended use of the product is for human consumption (of a kind), the differences in the warranties are not as great as the parties would have it appear—at least, in terms of the scope of the liability for the risk of harm.

Starting with the words of the Code itself, as one must, we find that the Code refers to the warranty against redhibitory vices only as an implied term of a contract of sale. Article 2520 defines the scope of the warranty as fitness for the use for which the thing was bought by the buyer:

"Art. 2520. Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have

---

warranty that the goods shall be of merchantable quality." 63 Col.L.Rev. 517. The Uniform Commercial Code is similar except that § 2–314 of the Code does not require a sale by description for the warranty of merchantability to apply; and, while the Uniform Sales Act provides that there is no implied warranty of fitness for a particulr purpose when the article is sold under its patent or trade name, the Code requires only reliance on the seller's "skill and judgment".

13. The warranty of quality has been treated extensively in the Tulane and Louisiana State Law Reviews. See especially the symposium on the subject in 23 Tulane Law Review 83–173 (1948). See also Morrow, Warranty of Quality: A Comparative Survey, 14 Tul.L.Rev. 327, 528 (1940); Malone, Res Ipsa Loquitur, and Proof by Inference, 4 La.L.Rev. 70 (1941); Rabel, The Nature of the Warranty of Quality, 24 Tul.L.Rev. 273 (1950); Fazio, A Comparison of Redhibition in Louisiana and the Uniform Com-

mercial Code, 19 La.L.Rev. 165 (1958); Murray, Implied Warranty Against Latent Defects: A Comparative Law Study, 21 La.L.Rev. 586 (1961); Jumonville, Liability for Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, 22 La.L.Rev. 435 (1962). And see Notes 5 Tul.L.Rev. 646 (1931); 14 Tul.L.Rev. 470 (1940); 13 La.L.Rev. 624 (1953); 14 La.L.Rev. 182 (1953); 27 Tul.L.Rev. 369 (1953); 33 Tul.L.Rev. 273 (1958); 37 Tul.L.Rev. 336 (1963).

14. In each instance where breach of warranty under Article 2520 is claimed, the first question is "whether the thing purchased served the purpose for which it was brought". Di Pietro v. LeBlanc, La. App.1953, 68 So.2d 156, 158. In the case of machinery, the question is whether it can be "successfully used for the operation for which it was constructed and sold". Nelson v. M.C.M. Truck Lines, 1946, 209 La. 582, 25 So.2d 236, 237.

purchased it, had he known of the vice."

Article 2522 provides for disclaimer, an escape valve of doubtful value to a seller of food products:

"The buyer can not institute the redhibitory action, on account of the latent defects which the seller has declared to him before or at the time of the sale. Testimonial proof of this declaration may be received."

The extent of liability for breach of warranty depends on whether the vendor was in good or bad faith. If a seller did not know of the vices, he is bound only to restore the price and pay expenses; if the seller knew of the vices he is answerable in damages. Thus:

"Art. 2431. The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses."

"Art. 2545. The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages."

However, the imputation of knowledge to a seller-fabricator reduces the utility of Article 2531 as a bar to liability.

These articles contemplate a direct, seller-buyer, contractual or commercial

law relationship, not a manufacturer-ultimate consumer relationship. In civilian terms, if the buyer would not have made the purchase had he known of the defect, his obligation is lacking in the "cause" which prompted him to buy.[15]

The defendants make a persuasive argument, but the fact is that the plaintiff relies on none of the articles touching on redhibition and expressly denies that her suit has anything to do with the warranty against redhibitory vices. Mrs. Lartigue's suit is not a redhibitory action to rescind her husband's lifetime purchases of cigarettes or an action of *quanti minoris* for a retroactive reduction in sales price. And, although Article 2545 does impose damages on the seller who has concealed the vices of the thing sold from the buyer, that was not the basis of the complaint. Moreover, the plaintiff's vendors who made the sales to Lartigue were *not* the defendant manufacturers. They were unknown retailers, subvendees. Unless by some awkward theory of subrogation or fictitious assignment enabling the last buyer eventually to reach the manufacturer, it is by no means certain that in Louisiana a redhibitory action reaches back through a chain of sales to the first seller.[16] The notion has never been advanced in any of the Louisiana cases involving a manufacturer of food products.

Article 2547 is especially significant in this case. It reads:

"Art. 2547. A declaration made by the seller, that the thing sold pos-

---

15. Fazio, A Comparison of Redhibition in Louisiana and the Uniform Commercial Code, 19 La.L.Rev. 165, 167 (1958).

16. A dictum in McEachern v. Plauche Lumber & Construction Co., 1952, 220 La 696, 57 So.2d 405, 408, suggests that Louisiana recognizes the extension of warranty against redhibitory vices to subvendees. The decision in LeBlanc v. Louisiana Coca Cola has been criticized because of the extension of implied warranty to one who was not a buyer. 13 La. L.Rev. 624 (1952).

In France the right to sue the original vendee for breach of warranty is trans-

mitted with the sale of the goods. 10 Huc, Commentaire théorique et pratique des droit civil 209 (1897); 17 Baudry-Lacantinerie et Saignot, Traité théorique et pratique de droit civil, De la vente et de l'echange 369 (2d ed. 1900). Professor Morrow has suggested that Article 2503 of the Louisiana Civil Code gives rise to the same rule. Morrow, Warranty of Quality: A Comparative Survey, 14 Tul.L.Rev. 529, 550 (1940). Note, 33 Tul.L.Rev. 275 (1958). See also Fazio, A Comparison of Redhibition in Louisiana and the Uniform Commercial Code, 19 La.L.Rev. 165, 171–183 (1958).

sesses some quality which he knows it does not possess, comes within the definition of fraud, and ought to be judged according to the rules laid down on the subject, under the title: Of Conventional Obligations.

"It may, according to circumstances, give rise to the redhibition, or to a reduction of the price, and to damages in favor of the buyer."

Thus, the Code itself distinguishes between the redhibitory action, based on implied warranty, arising from a sale and an action for fraud or deceit for misrepresentations which might arise, *as in this case, out of the same circumstances, assuming for example that the defendants made false representations in their advertising.*[17]

17. Section 402B of the Restatement of Torts Second provides:
"*§ 402B. MISREPRESENTATION BY SELLER OF CHATTELS TO CONSUMER*
ONE ENGAGED IN THE BUSINESS OF SELLING CHATTELS WHO, BY ADVERTISING, LABELS OR OTHERWISE, MAKES TO THE PUBLIC A MISREPRESENTATION OF A MATERIAL FACT CONCERNING THE CHARACTER OR QUALITY OF A CHATTEL SOLD BY HIM IS SUBJECT TO LIABILITY FOR PHYSICAL HARM TO A CONSUMER OF THE CHATTEL CAUSED BY JUSTIFIABLE RELIANCE UPON THE MISREPRESENTATION, EVEN THOUGH IT IS NOT MADE FRAUDULENTLY OR NEGLIGENTLY."
Cf. LeBlanc v. Louisiana Coca Cola Bottling Co., 1952, 221 La. 919, 60 So.2d 873 and Cooper v. R. J. Reynolds Tobacco Co., 1 Cir., 1956, 234 F.2d 170; 1958, 1 Cir., 256 F.2d 464, cert. den'd 358 U.S. 875, 79 S.Ct. 112, 3 L.Ed.2d 105.

18. Prosser writes: "There is no need to borrow a concept from the contract law of sales; and it is only by some violent pounding and twisting that 'warranty' can be made to serve the purpose at all. Why talk of it? If there is to be strict liability in tort, let there be strict liability in tort, declared outright, without an illusory contract mask." Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1134 (1960).

19. "Art. 2316. Every person is responsible for the damage he occasions not

To recover in this case, it is not necessary for the plaintiff to resort to the redhibition articles.[18] Article 2315 ("Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it") is broad enough to allow a consumer to recover damages against a manufacturer, either on negligence or, in food products cases, on strict liability without negligence. In Louisiana under Articles 2315 and 2316,[19] as in other states, a manufacturer of an injurious or defective product is liable to a consumer, when he fails to use due care in manufacturing a product. In the case of decayed foodstuffs or food products containing deleterious substances, the manufacturer is held to strict liability, without regard to negligence.[20]

merely by his act, but by his negligence, his imprudence, or his want of skill."

20. "[N]egligence law and 'fault' are different concepts. The attempt to identify them as the same can only result in endless confusion. Negligence law was evolved at the beginning of the industrial revolution, when enterprise was financially weak, for the purpose of *relieving* defendants of heavy *economic* liabilities. * * * 'Fault' gave way to the protection of our basic economic enterprises, and the victims of enterprise activities were for the most part left to lick their own wounds. "More lately and since enterprise has become financially strong and able to spread many of its risks among others, the policy of the law has steadily changed until negligence law is tending to make liability—in fact in many areas it has already become—even stricter than it was under the common law actions." Green, A Reply to Mr. Gay's Rejoinder, 34 Tex.L.Rev. 681 (1956).
Professor Malone, reviewing the Louisiana cases, writes: "Very often the determination of negligence or no negligence is not so much a matter of passing judgment upon the quality of the defendant's conduct as of seeking to elicit all hypotheses that point the finger of responsibility toward or away from him. * * * The employment of res ipsa loquitur in [food products cases] does not then result in a logical inference of negligence; for the existence of negligence is an immaterial issue. * * * It is obvious that resort to res ipsa loquitur is not necessary in this type of case, and its use by the courts amounts to little more than

Such liability is not inconsistent with the civilian requirement of "fault". Delictual responsibility without *dolus* (wilful harming) or *culpa* (negligent harming) is explainable in terms of presumption of fault. Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L.Rev. 1, 14, 19 (1952). Delicts (torts) do not have to depend on negligence. In the Civil Code, as in the common law, there are a number of instances of strict delictual liability when the law conclusively presumes fault notwithstanding the fact that the party liable did not will the damage and was not personally negligent.[21]

In the food products cases the Louisiana courts have seldom cited the articles on redhibitory defects.[22] In Doyle v. Fuerst & Kraemer, Ltd., 1911, 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480, one of the two leading cases in Louisiana, although the court used some of the codal language, the court did not mention the articles on redhibition. In that case a restaurateur was both the seller and the manufacturer or fabricator. The warranty against redhibitory vices was therefore unquestionably available to the plaintiff.[23] The court said:

"The principle which governs in this case is that every one ought to know the qualities, good or bad, of the things which he fabricates in the exercise of the art, craft, or business of which he makes public profession, and that lack of such knowledge is imputed to him as a fault, which makes him liable to the purchasers of his fabrications for the damage resulting from the vices or defects thereof which he did not make known to them and which they were ignorant of.

"This principle obtains both in the civil and the common law, as appears from the excerpts hereinafter given.

"The measure of damages in a case of this kind, where there was no actual knowledge of the vices of the things sold, but only an imputed knowledge, is not simply reimbursement of the price, as contended by defendant, but *liability on the part of the seller for all the damages that were foreseen, or could easily have been foreseen, as likely to result from the putting of the thing sold to the use for which it was sold.* This fully appears from the excerpts hereinafter given.

"It is common knowledge, to which the keeper of a public eating place must be held, that food *in which the process of decomposition has begun*

window dressing in the opinion." Malone, Res Ipsa Loquitur, 4 La.L.Rev. 70, 80, 97 (1941). See also Jaffe, Res Ipsa Loquitur Vindicated, 1 Buffalo L.Rev. 1, 13 (1951).

21. For example: Article 177 (master liable for damage caused "by whatever is thrown out of his house into the street or road"); Article 667 (owner of land liable for new work causing damage to his neighbor); Article 2321 (owner who has "turned loose a dangerous or noxious animal * * * must pay for all the harm done"); Article 2322 (owner of a building "answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction". See Harris, Liability Without Fault, 6 Tul.L.Rev. 337 (1932); Stone, Louisiana Tort Doctrine: The Concept of Fault, 27 Tul.L.Rev. 1

(1952). See also Williams v. Employers Liability Assurance Corp., 5 Cir., 1961, 296 F.2d 569.

22. "The clear intent of the Doyle case was to apply the presumption of knowledge only to a preparer of foodstuffs." Jumonville, Liability for Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, 22 La.L.Rev. 435, 438 (1962). See also Lesher v. Great Atlantic & Pacific Tea Co., La.App. 2d Cir., 1961, 129 So.2d 96, 97.

23. In the common law the concept developed that an innkeeper merely provieds a *service* for his guests; he does not *sell* food, a concept some courts still apply to restaurants and cafeterias. In Louisiana however, under Article 2439 of the LSA–Civil Code there is no doubt that a sale takes place when a customer dines in a restaurant. See Note, 37 Tul.L.Rev. 336 (1963).

*is liable to make the person who eats it ill.* Indeed, we do not think there can be any serious difference of opinion on the point that an eating establishment which *sells unwholesome food to be consumed by its customers must be held to have contemplated the probable effects* of such tainted food upon the customer. * * *

"It can be considered to be also well settled at common law that the vendor of articles of food for consumption by the purchaser *warrants their wholesomeness.*" (We have supplied the emphasis in order to point out that this strict liability is nevertheless dependent on the foreseeability of harm.)

The court quoted Pothier, Dalloz, Baudry-Lacantinerie & Saignat, Laurent, and Troplong to the effect that when the seller is the one who fabricates the product, he is bound to repair the damage caused by hidden defects, even though ignorant of the defects. The Court's language, especially its frequent use of the words "fabricates" and "fabrication", indicate that the rationale of the decision is that because of the manufacturer's superior position his lack of knowledge is a "fault". This may be just another way of stating that, for purposes of a warranty against redhibitory vices, the same result may be reached by a conclusive presumption that a seller who is also a manufacturer knows the qualities of the article he fabricates and sells.[24] Under either view there is strict liability for a hidden defect, but Doyle's teaching is that in Louisiana the scope of the liability is limited to defects producing *"damages that were foreseen, or could easily have been foreseen."*

In LeBlanc v. Louisiana Coca Cola Bottling Co., 1952, 221 La. 919, 60 So.2d 873, the other key case in Louisiana, there could not have been an implied warranty against redhibitory vices, even on an assignment theory: no sale was made to the plaintiff.[25] The plaintiff found a decomposed housefly in a bottle which a neighbor *gave* her. The court allowed recovery on the theory that the manufacturer of foodstuffs in sealed containers or capped bottles "by advertisements extolling the quality of its product" had warranted the "wholesomeness" of its product to consumers. Although the Court did not say so, the advertising might be regarded as the "declaration * * * within the definition of fraud" referred to in Article 2547. In any event the warranty is not the warranty against redhibitory defects. "The theory of the case is based upon tort rather than contract law."[26] Justice McCaleb, for the Court said:

"It is to be borne in mind in these cases that the defendant company is engaged in the business of distributing its beverages to the public in sealed containers or capped bottles and that, by the very nature of its enterprise, it represents, we think, by advertisements extolling the quality of its product, that it is *fit for human consumption and free from deleterious matter.* And, while there is not a direct contract to this effect between the consuming public and the manufacturer (as it distributes to retailers or mid-

24. "[A] manufacturer who disposes of the things which he himself has manufactured can properly and legitimately be held presumptively to a knowledge of the qualities of the things he sells." George v. Shreveport Cotton Oil Co., 1905, 114 La. 498, 505, 38 So. 432, 434. See also Templeman Bros. Lumber Co. v. Fairbanks, Morse & Co., 1911, 129 La. 983, 1002, 57 So. 309, 315; Radalec, Inc. v. Automatic Firing Corp., 1955, 228 La. 116, 125, 81 So.2d 830, 833.

25. Similarly, in Miller v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Div., 1954, 70 So.2d 409, a guest of the final purchaser's daughter was allowed to recover against the manufacturer.

26. Note, 27 Tul.L.Rev. 370. Professor Ferd Stone agrees. Stone, Tort Doctrine in Louisiana, 27 Tul.L.Rev. 1, 14 (1952).

dlemen who in turn sell to the consumer), it is fair to imply that, since the manufacturer, in marketing its products in capped bottles, intends them to reach the consumer in the same condition in which they leave the factory, a *warranty of wholesomeness exists* between it and the consumer."

Contrary to previous food products cases in which res ipsa was invoked, the plaintiff was relieved of the burden of proving that a middleman or retailer had not tampered with the bottle; the defendant was saddled with the burden of proving that there was tampering after the bottle left his plant. "Applying the doctrine of implied warranty on a manufacturer of such bottled beverages is almost tantamount to making him an insurer and practically imposing absolute liability on him." [27]

In the interim between Doyle and LeBlanc [28] the Louisiana Supreme Court decided only one food case, Mayerhefer v. Louisiana Coca-Cola Bottling Co., 1951, 219 La. 320, 52 So.2d 866. In that case the plaintiff became ill from drinking Coca-Cola containing free iodine. The court treated the problem purely as one in tort. The only question was whether the evidence met the requirements necessary for application of res ipsa loquitur. "Each case", said the court, "involving tort liability stands or falls on the proof made of the facts alleged."

Before LeBlanc, Louisiana courts of appeal in food products cases usually based recovery on negligence.[29] After LeBlanc, courts of appeal have allowed recovery on breach of implied warranty treated as a tort.[30] They have had no trouble therefore with privity. In at least one food products case the court said unequivocally, "This is an action in tort by plaintiff." Morrow v. Bunkie Coca-Cola Bottling Co., 1956, La.App. 2 Cir., 84 So.2d 851, 852.

In Arnaud's Restaurant, Inc. v. Cotter, 5 Cir., 1954, 212 F.2d 883, cert. den'd 348 U.S. 915, 75 S.Ct. 295, 99 L.Ed. 717, this Court reviewed the Louisiana food products cases. This Court noted that although there is a divergence of opinion among the State courts as to whether a manufacturer's liability is predicated upon negligence or an implied warranty, "under Louisiana jurisprudence a plain-

---

27. From the concurring opinion of Judge LeBlanc.

28. "Although the Doyle case appears to have been decided on a warranty basis, the jurisprudence dealing with deleterious food and drink in the ensuing forty years is an admixture of tort and contract principles, the tort doctrine of res ipsa loquitur being frequently employed." Jumonville, Liability for Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, 22 La.L.Rev. 435 (1962).

29. Moore v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1952, 58 So.2d 310; Day v. Hammond Coca Cola Bottling Co., La.App. 1st Cir., 1951, 53 So.2d 447; Nichols v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1950, 46 So.2d 695; Mayerhefer v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1950, 45 So.2d 442; White v. Coca-Cola Bottling Co., La.App. 2 Cir., 1943, 16 So.2d 579; Jenkins v. Bogalusa Coca Cola Bottling Co., La.App., 1st Cir., 1941, 1 So.2d 426; Hollis v. Ouachita Coca-Cola Bottling Co., La.App. 2d Cir.,

1940, 196 So. 376; Dye v. American Beverage Co., La.App.Orl.Cir., 1940, 194 So. 438; Freeman v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1938, 179 So. 621; Kelly v. Ouachita Dairy Dealers Cooperative Ass'n, La.App. 2d Cir., 1937, 175 So. 499; Hill v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1936, 170 So. 45; Lee v. Smith, La.App. 1st Cir., 1936, 168 So. 727; Watts v. Ouachita Coca-Cola Bottling Co., La.App. 2d Cir., 1936, 166 So. 151; King v. Louisiana Coca-Cola Bottling Co., La.App. Orl.Cir., 1933, 151 So. 252; Dean v. Alexandria Coca-Cola Bottling Co., La. App. 2d Cir., 1933, 148 So. 448.

30. Lesher v. Great Atlantic & Pacific Tea Co., La.App. 2d Cir., 1961, 129 So.2d 96; Reine v. Baton Rouge Coca Cola Bottling Co., La.App. 1 Cir., 1961, 126 So.2d 635; Walker v. American Beverage Co., La.App. 4 Cir., 1960, 124 So. 2d 157; Miller v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1954, 70 So.2d 409; Montz v. Louisiana Coca-Cola Bottling Co., La.App.Orl.Cir., 1953, 64 So. 2d 805.

tiff in such a case is entitled to rely upon the manufacturer's implied warranty." The warranty is that the "product is safe for human consumption." The Court held that the question of contributory negligence was for the jury, perhaps an indication that the Court recognized the tortious character of the action.[31]

Our review of state cases indicates that in Louisiana the law imposes strict liability on a manufacturer for breach of the implied warranty of wholesomeness that a food product is safe for human consumption. This warranty of wholesomeness may co-exist with the warranty against redhibitory vices but the manufacturer's warranty is directly to the consumer and distinct from any conventional obligation he assumes to his immediate buyer or that is imposed upon him by the redhibition articles of the Code. The Doyle and Arnaud cases involved restaurateurs who were sellers as well as "fabricators". In the LeBlanc case the defendant was a manufacturer. The reasoning in all three cases indicates that the liability is delictual, imposed not because of the redhibition articles but because the party responsible for the product, in control of its preparation, and therefore in a superior position, breached his duty to the ultimate consumers who rely on him to furnish goods reasonably safe for human consumption.

C. The same public policy reasons which justify holding a manufacturer to strict liability for food products apply to cigarettes. Although there is some authority to the contrary,[32] courts have applied the rule to foreign substances in cigarettes (Liggett & Myers Tobacco v. DeLape, 9 Cir., 1940, 109 F.2d 598), smoking tobacco (Foley v. Liggett & Myers Tobacco Co., 1930, 136 Misc. 468, 241 N.Y.S. 233, aff'd 232 App.Div. 822, 249 N.Y.S. 924), and chewing tobacco (Pillars v. R. J. Reynolds Tobacco Co., 1918, 117 Miss. 490, 78 So. 365). In Pillars the plaintiff sued a retailer and a manufacturer for damages alleged sustained as a result of finding a "human toe in a state of putrefaction" embedded in a plug of Brown Mule Chewing Tobacco. In allowing the retailer to escape liability but holding the manufacturer liable, the Court said:

"The fact that the courts have at this time made only the exceptions mentioned to the general rule does not prevent a step forward for the health and life of the public. The principles announced in the cases which recognize the exceptions, in our opinion, apply, with equal force, to this case.

"We believe that the way the tobacco is to be used furnishes the reason for great care in its preparation. * * * Anything taken into the mouth there to be masticated should be free of those elements which may endanger the life or health of the user."

In recent years courts in some of the states have held the manufacturers liable to consumers on implied warranty not only for such articles as hair dye (Graham v. Bottenfield's Inc., 1954, 176 Kan. 68, 269 P.2d 413), a permanent wave solution (Markovich v. McKesson & Robbins, 1958, 106 Ohio App. 265, 149 N.E. 2d 181), and a detergent (Worley v. Proctor and Gamble Mfg. Co., 1952, 241 Mo.App. 1114, 253 S.W.2d 532), but also for cinder building blocks (Spence v. Three Rivers Builders & Masonry Supply, Inc., 1958, 353 Mich. 120, 90 N.W.2d 873), automobile tires (B. F. Goodrich Co. v. Hammond, 10 Cir., 1959, 269 F.2d 501), and automobiles (Henningsen v. Bloomfield Motors, 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1).[33] For purposes

---

31. On contributory negligence as a defense, see 1 Frumer & Friedman § 16.01 [3] (1961).

32. Liggett & Myers Tobacco Co. v. Cannon, 1915, 132 Tenn. 419, 178 S.W. 1009, L.R.A.1916A, 940; Block v. Liggett & Myers Tobacco Co., 1937, 162 Misc. 325, 296 N.Y.S. 922.

33. In Henningsen the Court said that it could "see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automo-

of defining the scope of strict liability imposed on sellers, the American Law Institute in the Restatement of Torts Second classifies cigarettes with food and drink and other articles intended for human consumption as *"products intended for intimate bodily use"*.[34]

■ Louisiana courts were quick to get around the notion of privity as a necessary element in holding a manufacturer liable on his warranty. In this case it is not necessary to go as far as the court went in Henningsen. Making an Erie educated guess, we hold that for purposes of this litigation Louisiana courts would classify cigarettes with food and drink.

■ D. Thus far we have been in accord with the plaintiff's theory of the case. At this point, however, we part company with the plaintiff. We agree that the manufacturer of tobacco should be classified with the food processor and held to warrant the wholesomeness of his product, (that is, he is strictly liable in tort for an unwholesome product)— but, as in the case of the food processor,

the strict liability should apply only when, in the words of the Doyle opinion, "the damages * * * were foreseen, or could easily have been foreseen, as likely to result from the putting of the thing sold to the use for which it was sold." No case in Louisiana has applied the rule of strict liability, even in food cases, except when harm from the defective condition was a foreseeable consequence of the defect. As suggested, this language, although often used with reference to negligence, is basic to the trial court's duty here of explaining the scope of the warranty of wholesomeness.

■ Under the doctrine of strict liability it is not necessary for the plaintiff to show that the defendant failed to use due care or that the defendant had knowledge of the defective condition. However, it *is* necessary to show that the warranted product contained an element from which, on the basis of existing human knowledge, harm might be expected to flow. Thus, in Doyle the plaintiff had ptomaine poisoning from eating the defendant's spoiled cakes. In LeBlanc and Mayerhefer there was a foreign sub-

bile". A number of commentators believe that Henningsen will be as important in the implied warranty cases as McPherson v. Buick Motor Co. was in the negligence cases. See Restatement of the Law of Torts Second, § 402A, Tent. Draft No. 7 (1962); 1 Frumer & Friedman, Products Liability § 16.04, p. 406 (1960).

34. *"Intimate Bodily use.* Products intended for intimate bodily use, as that phrase is used in this Section, include all food and drink, and everything intended for internal human consumption, whether or not it has nutritional value. Thus the term includes candy, chewing gum or chewing tobacco, snuff, cigarettes, and all raw materials, such as unground coffee, from which the consumer or some intermediate party is expected to prepare food or drink ultimately to be consumed. It includes drugs which are to be taken internally, and such an article as a surgical pin for setting bone fractures, which is to be incorporated inside of the body.

" 'Intimate bodily use' also includes products intended for external application or contact with the human body, where such application or contact is of an 'intimate' character. This does not mean that everything which may be expected to come in contact with the person is to be included. A nail is not intended for intimate bodily use, merely because the user may be expected to hold it in his fingers while he drives it with a hammer. On the other hand, products such as clothing, intended to have close and continued contact with the body, are for intimate bodily use. So are soap and cosmetics, liniments or other medical preparations for external application, hair dye, solutions for imparting a permanent wave to the hair, and similar products intended to affect in some manner the body itself. In determining whether a product is for intimate bodily use, the question is one of whether it is intended for a purpose which involves long continued contact with the person, or such close and personal contact or application, even in a single instance, that the ordinary man would recognize that something more than a casual touching, something amounting to an intimate approach to his person, is involved." Restatement of Torts Second § 402A Comment (Tent. Draft No. 7 (1962).

stance, a decomposed housefly in a bottle of Coca-Cola. In Arnaud there was a piece of crab shell, natural to the crab but foreign to *pompano en papilotte*. In McAvin v. Morrison Cafeteria Co. of La., La.App., 1956, 85 So.2d 63, and in Ogden v. Rosedale Inn, La.App.1939, 189 So. 162, shrimp salad was spoiled. In McLehan v. Loft Candy Stores, La.App., 1937, 173 So. 367 mincemeat was spoiled. Bottled drinks seem to have a special affinity for foreign substances.[35] Walker v. American Beverage Co., La.App., 1960, 124 So.2d 157; Kelly v. Ouachita Dairy Dealers Cooperative Association, La.App., 1937, 175 So. 499; Dye v. American Beverage Co., La.App., 1940, 194 So. 438; Hollis v. Ouachita Coca-Cola Bottling Co., La.App., 1940, 196 So. 376. Walker found a vegetable stalk in his Coca-Cola, Kelly found maggots in a milk bottle, Dye found some vegetable matter in his R. C. Cola, and Hollis found in his Coca-Cola—just part—of a black widow spider.

■ In all of these cases the injury was caused by a foreign substance or by spoiled food. ( The risk of their being such injuries is incident to the business and known to all.) When a manufacturer or a processor places food products in the channels of commerce for human consumption he assumes a special responsibility to the public. The consumer, helpless to protect himself, has the right to expect, in the case of products so vitally important to human existence and the health of the community as food and other products for intimate bodily use, that the products are reasonably fit for the purposes for which they were sold; the goods therefore must comply with reasonable and ascertainable standards of safety. The manufacturer presumably exercises due care to comply with proper standards, but he also knows that a "wee, sleekit, cow'rin, tim'rous" mousie may outwit his bestlaid plans for a clean plant. (Public policy demands that the burden of any accidental injuries caused by such products be placed upon those who produce and market the products and know the risks. The injuries from knowable risks are a cost of production for the industry to bear; they are passed on to consumers. The consumer of such products is entitled to a maximum of protection at the hands of some one, and the proper persons to afford it are those who receive the benefits from manufacturing and marketing the products)

■ But it is reasonable to draw a line somewhere: a manufacturer of food products is not like one who keeps a tiger for a pet in a crowded city. Louisiana draws the line at unknowable risks. For strict liability to apply there must be foreseeability of harm.[36] In every decided Louisiana case the food was unreasonably dangerous because of

35. "[T]he rats of Hamlin were as nought in comparison with that horde of mice which has sought refreshment within Coca-Cola bottles and died of a happy surfeit." Spruill, Privity of Contract as a Requisite on Warranty, 19 N.C.L.Rev. 551, 566 (1941).

36. "A more difficult problem [then damage] is that of what Professor Ehrenzweig has called 'typicality' of the injury. Put in more ordinary language, this means the foreseeability of the harm—the seller's reasonable anticipation of it as a normal consequence of the consumption or use of his product if it should turn out to be defective. It is the sort of issue that is likely to be buried under the name of 'proximate cause.' There has been virtually no consideration of this problem in the cases with which we are dealing, undoubtedly because food poisoning is such an obvious result of bad food. We are thrown back upon two reasonably close analogies: the direct warranty from the retailer to his purchaser, and the negligence action against the manufacturer. * * * [T]he problem is reduced to one of what the consumer has a right to expect, which is a product reasonably fit for the purposes for which it is sold; and strict liability should call for no different conclusion. * * * Few products can ever be made entirely safe, and the producer cannot be made an insurer of every one who may possibly be hurt." Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer) 1099, 1143, 1145 (1960).

a defective condition, not contemplated by the ultimate consumer; in every case risk of harm could reasonably be foreseen as a consequence of the existence of the defect. As stated in Justice LeBlanc's opinion in LeBlanc, the effect of the warranty of the manufacturer's warranty is "almost tantamount to making him an insurer." He is an insurer against foreseeable risks—but not against unknowable risks.

( Strict liability on the warranty of wholesomeness, without regard to negligence, "does not mean that goods are warranted to be foolproof or incapable of producing injury )* * * By and large, the standard of safety of the goods is the same under the warranty theory as under the negligence theory." [37] The article sold must be unreasonably dangerous to the ordinary consumer, with the knowledge common to the community as to its characterization. For example, sugar is unwholesome to diabetics. Ice cream and butter may contain sufficient cholesterol to be unwholesome to persons with high blood pressure and heart trouble. Whiskey is unwholesome to alcoholics. Diabetics who eat sugar, heart cases who cannot resist ice cream or butter, and alcoholics who drink too much whiskey know that the strict warranty of wholesomeness puts no money in the bank for them. Thus, in a concurring opinion in Pritchard v. Liggett & Myers, 3 Cir., 1962, 295 F.2d 292, Judge Goodrich made a cogent comment which the court acted on: [38]

"If a man buys whiskey and drinks too much of it and gets some liver trouble as a result I do not think the manufacturer is liable unless (1) the manufacturer tells the customer the whiskey will not hurt him or (2) the whiskey is adulterated whiskey—made with methyl alcohol, for instance. The same surely is true of one who churns and sells butter to a customer who would be on a nonfat diet. The same is true, likewise, as to one who roasts and sells salted peanuts to a customer who should be on a no-salt diet. Surely if the butter and the peanuts are pure there is no liability if the cholesterol count rises dangerously.

"In this case there was no claim that Chesterfields are not made of commercially satisfactory · tobacco. See Restatement (Second), Torts § 402A (Tent. Draft No. 6, 1961)."

In Green v. American Tobacco Co., 5 Cir., 1962, 304 F.2d 70, this Court had before it a Florida case of lung cancer allegedly caused by smoking.[39] The jury returned a general verdict for the defendant. In answer to special interrogatories, the jury found that the decedent had cancer and that smoking was a proximate cause of his cancer, but that the defendant "by the reasonable application of human skill and foresight" could not have known prior to February 1, 1956, when it was first discovered that Green

---

37. 2 Harper & James, Law of Torts § 28.- 22, p. 1584 (1961).

In a recent California case the Court said "The essential inquiry, thus, is. the same in respect to the breach of warranty theory as to the negligence claim: whether the defendant complied with the standard of reasonable care in ascertaining the fitness of the chattel for the use for which he knew it was hired." Tierstein v. Licht, 1959, 174 Cal.App.2d 835, 345 P.2d 341.

38. The Court cautioned the trial judge on remand to submit the case to the jury on interrogatories to ascertain the basis

of liability, if any, "[i]n light of the concurring opinion."

39. The trial judge's charge in the case before us is similar to the charge in Green. On an important point, however, it is more favorable to the plaintiff here, since the jury was required to find that the "implied warranty does not cover substances in the manufactured products, the harmful effects of which *no* developed human skill or foresight can afford". In Green the interrogatory allowed the manufacturer to escape liability if the jury found that the defendant had used "reasonable application of human skill and foresight."

had cancer that users of cigarettes would be in danger of contracting cancer. A majority of the Court affirmed the judgment.[40] On rehearing, the Court "remain[ed] of the same views as expressed * * * on the original hearing" although it certified the question to the Supreme Court of Florida.[41]

The plaintiff's main insistence in that case was similar to the plaintiff's argument in this case:

"The fundamental point upon which the plaintiffs rely on this appeal is that the Trial Court erred, as a matter of law, in ruling that the implied warranty of fitness which a manufacturer of products for human consumption is held by Florida law to make does not cover deleterious substances in its products, the *harmful effects of which are unknown to the manufacturer and could not have been known by any developed human skill or foresight.* Plaintiffs contend that the knowledge of the manufacturer is irrelevant and immaterial to the manufacturer's liability on an implied warranty under Florida law, and that a manufacturer's implied warranty is not limited to harmful substances of which the manufacturer either had knowledge, or should have had knowledge, or could have had knowledge according to developed human skill and foresight."

This Court ruled that the defendant "could not be held liable as an absolute insurer against consequences of which no developed human skill and foresight could afford knowledge."[42] In language suggestive of the opinions in the Lou-

*but Fla. ct ruled opposite in Green]*

has to smoke. These distinctions may not be valid in later cigarette cases or in a case involving a different kind of product, for example, a 'polio vaccine which functions in reverse and contains a virus not in other polio vaccines. In such cases a different result may be reached consistent with Green and the instant case. In addition, the advance of scientific knowledge and the forward movement of public policy may suggest a different result in later cases.

*Perhaps*
*La Test*
*Thorndike*

40. The Court divided into three classes the cases dealing with products intended for human consumption: (1) "those believed by all to be wholesome, for example, most foods; (2) those known by all to be injurious to some while perhaps beneficial or pleasurable to others, for example, alcoholic beverages; (3) those heretofore thought by all to be wholesome or tolerable, but which constantly expanding scientific research, thought and knowledge have now proved, or at least convinced many, to be injurious, such as cigarettes in the smoke of which appear polycyclic aramatic hydrocarbons and minute quantities of arsenic, and eggs, milk and butter with their high cholesterol content". In all three classes the consumer relies on the superior skill and knowledge of the seller, but in the last class it is a question of fact to be determined by the jury whether the seller, in the estimation of the parties, had a superior opportunity to gain knowledge of the product and whether the buyer relied on the judgment of the seller. It seems to us that the Court properly classified the products. Cigarettes (possibly causing cancer) and dairy products (possibly causing high cholesterol) are different from foods containing foreign substances: (1) The defendant tobacco companies have no more knowledge of the risk of harm than the plaintiff; (2) the defendants' cigarettes are an established product containing commercially acceptable tobacco; (3) nobody

41. 304 F.2d 85, question certified to Supreme Court of Florida, Civil No. 19003, 5 Cir., Aug. 8, 1962. See Fla.Stat.Ann. § 25.031 (1961). This Court certified the following question: "Does the law of Florida impose on a manufacturer and distributor of cigarettes absolute liability, as for breach of implied warranty, for death caused by using such cigarettes from 1924 or 1925 until February 1, 1956, the cancer having developed prior to February 1, 1956, and the death occurring February 25, 1958, when the defendant manufacturer * * * could not on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight, have known that users of such cigarettes would be endangered, by the inhalation of the main stream smoke from such cigarettes, of contracting cancer of the lung?"

42. Accord Pritchard v. Liggett & Myers Tobacco Co., D.C.W.D.Pa.1962, on remand.

isiana cases, Judge Rives, speaking for the Court, said:

"With that insistence we cannot agree. To the contrary, we are convinced that the doctrine of implied warranty by a manufacturer and seller of the qualities and fitness of the thing sold for the purpose for which it is intended or desired is *founded on his superior opportunity to gain knowledge of the product and to form a judgment of its fitness.* That principle can clearly be deduced from all of the Florida cases on implied warranty whether by the manufacturer or by the dealer."

Here the manufacturer "had no opportunity to gain knowledge, or to form a judgment as to the dangerous qualities of the product". The manufacturer was in no better position than the consumer.

 E. We recognize, as the appellant points out, that the trial judge instructed the jury on the "warranty of general quality" against redhibitory vices. The warranties of quality and wholesomeness, however, partly overlap: the fitness of cigarettes for use, under Article 2520 of the Code, is essentially the same as their fitness for human consumption. The trial court specifically charged that the manufacturer warrants wholesomeness:

"The manufacturer of products which are offered for sale to the public in their original package for human consumption use, impliedly warrants that its products are *reasonably wholesome* or fit for the purpose for which they are sold."

The appellant complains that the trial judge defined the scope of the warranty of wholesomeness in terms of the foreseeable risk of harm. The trial judge said:

"But such implied warranty does not cover substances in the manufactured products, *the harmful effects of which no developed human skill or foresight can [avoid]* * * If you find that at the time Mr. Lartigue's cancer started, the ciga-

rettes manufactured by the defendants were usable as such, and that the state of medical knowledge was then such that the defendants could not have anticipated in the exercise of reasonable care that their products would cause cancer, then your verdict on the issue of implied warranty, would be in favor of the defendants."

This is the language of Doyle and Le-Blanc, the leading cases in Louisiana. It is also the language of Green which this Court has approved. Moreover, there is no qualification to the requirement that the harmful effects must be of such a character that *"no* developed human skill or foresight" could have avoided them.

 Assuming facts favorable to the plaintiff in this case, recovery might be grounded on (1) negligence, (2) fraud for misrepresentation, (3) implied warranty against redhibitory vices, and (4) strict liability or implied warranty of wholesomeness of articles of intimate bodily use. Possibly the trial judge might have surveyed these grounds and marked off the boundary lines more precisely than he marked them off in his charge to the jury. But the law of products liability is still developing, guidelines are not sharp and clear, and the warranties (such as they now are) overlap. Reading the charge as a whole, it seems to us that the plaintiff received the full benefit of the manufacturer's implied warranty of wholesomeness. At this stage of the law and of human knowledge, in Louisiana a manufacturer of food and cigarettes is strictly liable for foreseeable harm resulting from a defective condition in the product when the consumer uses the product for the purposes for which it was manufactured and marketed. Thus far, public policy has not decreed absolute liability for "the harmful effects of which no developed skill or foresight can avoid." At this point, it cannot be said that cigarette smokers who started smoking before the great cancer-smoking debate relied on the tobacco companies' "warranty" that

their cigarettes had no carcinogenic element. Today, the manufacturer is not an insurer against the unknowable.

## III.

The principal aspect of the negligence claim which the appellant asks the Court to consider is that the trial judge erred in giving the following instruction:

"The plaintiff contends that the defendants were negligent in not warning the public, and particularly Frank J. Lartigue, that the use of their tobacco would cause or precipitate cancer of the vocal cord or lung. As a fundamental principle of law, before any person can be charged with negligence of this sort, it must be established that he had knowledge of some inherent danger or defective condition of his product. This knowledge may be either actual knowledge or such knowledge as a reasonably prudent man should have acquired under the circumstances. Plaintiff must prove that defendants knew or should have known before Mr. Lartigue's lung cancer started, that their product could cause that disease. Under the circumstances of this case, such knowledge can only be had by these defendants if medical science also had it and had made it publicly known at the time that Mr. Lartigue's lung cancer started. The mere failure to warn against the result which could not have been reasonably anticipated, is not actionable negligence. The defendants cannot be held guilty of negligence on the basis of medical opinion, surveys, or other similar materials not announced until after that time."

The contention is that the instruction placed an impossible burden of proof on the plaintiff and erroneously limited the time when the defendants were required to give warning.

The instruction seems fair to us. It amounts to saying that a manufacturer charged with negligence for some inherent danger or defective condition in his product is held to the standard of reasonable care. In determining this standard it is proper for the jury to take into account the state of medical knowledge before Lartigue's cancer started. The tobacco companies cannot be held liable for negligence on the basis of medical studies yet to be published. The trial judge was careful not to limit his instructions on knowledge to the defendants' knowledge. He charged:

"[Y]ou should consider that even if defendants did not know of the dangerous substances in their products, you should consider from the evidence whether they should have taken steps to ascertain the effects of their products when used for human use, especially as to whether their products would cause or be a contributing cause in the development of cancer of the lung and larynx."

The timing of any warning and the effect of a failure to warn, both before and after Lartigue's cancer started, were matters for the jury to decide. The instructions gave the jury sufficient latitude to have decided these matters in favor of the plaintiff.

Taking the charge as a whole, we find that it was fair, balanced, and free from reversible error.

The Court has carefully considered all of the appellant's contentions whether or not discussed in this opinion.

The judgment is

Affirmed.